# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# OXFORD DIVISION

**ROBERT FOSTER; KATIE LIGON;**          **PLAINTIFFS**
**KIRBY CARTER; and JOHN WILLIAMS**

**VS.**          **CIVIL ACTION NO.: 3:26-CV-181-SA-JMV**

**THE STATE OF MISSISSIPPI; THE STATE
BOARD OF ELECTION COMMISSIONERS;
TATE REEVES, in his official capacities as
Governor of the State of Mississippi and a
Member of the State Board of Election
Commissioners; LYNN FITCH, in her official
capacities as the Mississippi Attorney General
and a Member of the State Board of Election
Commissioners; and MICHAEL WATSON, in
his official capacities as the Mississippi Secretary
of State and a Member of the State Board of
Election Commissioners**          **RESPONDENTS**

---

## MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

---

The State of Mississippi, the State Board of Election Commissioners ("SBEC"), and Governor Tate Reeves, Attorney General Lynn Fitch, and Secretary of State Michael Watson, all in their official capacities, submit this memorandum in opposition to Plaintiffs' motion for preliminary injunction. *See* [Docs. 3, 4].

## INTRODUCTION

The Court should deny Plaintiffs' request for an injunction. Plaintiffs unnecessarily delayed commencing this action until just weeks before the election effectively begins. The statutes that Plaintiffs seek to challenge were signed into law by the Governor on April 23, 2025, 15 months ago. Candidate qualifying for the challenged positions ended on February 2, 2026, nearly six months ago. Candidates for the challenged positions have been campaigning for at least six months, committing both substantial time and financial resources. The Secretary of

1

State has completed his review of the qualifications of all candidates seeking election on November 3, 2026, and the sample ballot has been prepared for approval by the SBEC. The election process effectively begins on September 4th—just 46 days from today—when the approved sample ballot must be made available to circuit clerks throughout the State. Voting begins in 61 days, on September 19th.

Plaintiffs' late-requested relief contravenes the United States Supreme Court's "bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)). The Supreme Court's *Purcell* principle "heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.* Plaintiffs have not made, and cannot make, that heightened showing. Because Plaintiffs waited so late to file their lawsuit, the requested injunction is not feasible without significant cost, confusion, and hardship. At this late juncture, any injunction would necessarily cause limited access to DeSoto County's courts and voter confusion, loss of confidence in the election system, undue burden on the State's and DeSoto County's election officials, chaos for candidates and campaign organizations, and other unanticipated and unfair consequences. The State and public have strong interests in avoiding those unsettling consequences, and those interests far outweigh any factor that favors an injunction. Plaintiffs' requested injunction is improper for these and other reasons, and Defendants request that the Court deny Plaintiffs' motion for preliminary injunction.

## BACKGROUND

Plaintiffs filed a lawsuit and "urgent and necessitous" motion for preliminary injunction on July 2, 2026 to challenge the constitutionality of two election laws that were passed by the Mississippi Legislature in the 2025 session and signed by the Governor on April 23, 2025, well

over a year before the lawsuit was filed. *See* [Doc. 1]; [Docs. 3, 4] (urgent and necessitous motion); [Doc. 3-1] (House Bill 1544); [Doc. 3-2] (Senate Bill 2768).

The Mississippi Constitution mandates that either the Legislature redistrict the State's circuit and chancery court districts by the fifth year following each federal decennial census (*i.e.*, every 10 years), or, alternatively, that "the [Mississippi] Supreme Court shall, by order, redistrict such circuit or chancery court districts." Miss. Const. Art. 6, § 152. The Constitution further provides that the Legislature shall "establish certain criteria by which the number of judges in each district shall be determined, such criteria to be based on population, the number of cases filed and other appropriate data." *Id.* The criteria established by the Legislature include:

> (a) The population of the district;
>
> (b) The number of cases filed in the district;
>
> (c) The caseload of each chancellor in the district;
>
> (d) The geographic area of the district;
>
> (e) An analysis of the needs of the district by the court personnel of the district; and
>
> (f) Any other appropriate criteria, as determined by the Legislature.

Miss. Code Ann. § 9-5-3(3) (Chancery Court); *see also* Miss. Code Ann. § 9-7-3(3) (same for Circuit Court).

Given the 2020 federal census and the resulting 2025 deadline to pass a judicial redistricting law, the Legislature first took up the required judicial redistricting in the 2024 session. Debates on Miss. Senate Floor, Apr. 10, 2024, (Ex. 2) at 0:01, available at https://www.youtube.com/watch?v=1KBVjjDMZ-w (6:21:50). The paramount concern in 2024, according to Senate Judiciary A Committee Chairman Brice Wiggins, was that the data collected showed "tremendous deviations" in population and caseload among the state's judicial districts. *Id.* at 3:08 (6:24:50). The data showed that some judicial districts had populations as low as

3

40,000 while the DeSoto County districts had "as high as 240,000." *Id.* at 3:41 (6:25:24). Likewise, some judges in the State had only 80 active cases while some had 1,200 or 1,500 cases. *Id.* at 6:57 (6:28:40). In the Chairman's opinion, the bill was necessary because "citizens deserve an efficient and fair access to their courts." *Id.* at 6:38 (6:28:21). The bill's proponents also stated that they introduced and sought to pass the bill in 2024 to give the judicial candidates "a year and a half to know what the districts look like." *Id.* at 35:46 (6:57:28). The Chairman further stated it would be inadvisable and unfair to amend the districts "only four months before qualifying starts." *Id.* at 36:01 (6:57:43). While this bill was first introduced during the 2024 session, it did not ultimately pass in 2024.

But a year later in 2025 (as in 2024), House Bill 1544 and Senate Bill 2768 were introduced to address "a problem pertaining to caseload and movements of caseloads." *See* Debates on MS House Floor, Feb. 6, 2025, at 5:08:30, [Doc. 3-5], available at https://www.youtube.com/watch?v=SPptg5D1nVo. The House sponsor stated that the Judiciary Committee "considered the criteria in the code section" referenced above, *i.e.*, population changes, number of cases filed in the district, and caseload of the judges in the various districts. *Id.* at 5:27:40. Proponents and opponents alike acknowledged "[t]here have been some population shifts and the re[districting] is necessary in places like Desoto County for sure. Certainly." *Id.* at 4:53:00. The Senate Judiciary Committee Chairman likewise stated that the changes to the districts were based on the statutory criteria and data on population, caseload, and geographic boundaries. Debates on MS Senate Floor, Feb. 10, 2025, at 59:00 [Doc. 3-4]; available at https://www.youtube.com/watch?v=GHCDZdX8L0s.

House Bill 1544 passed the House on February 6, 2025 and passed the Senate as amended on March 6, 2025. *See* Bill Tracker H.B. 1544 (Ex. 3). Senate Bill 2768 passed the Senate on February 10, 2025 and passed the House as amended on February 27, 2025. *See* Bill

Tracker S.B. 2768 (Ex. 4). The bills were referred to conference, and the conference reports were adopted overwhelmingly on April 1 and April 2, 2025.[1] Both were signed by the Governor on April 23, 2025. *See* Ex. 3 and Ex. 4.

Today, in July 2026, the elections for the DeSoto County Chancery Court and Circuit Court have been in motion for months. *See* Declaration of Laura Henderson-Courtney (Ex. 1). That the two judges would be elected in 2026 was available in near-real time when the bills were passed. The qualifying deadlines for those seats was 5 p.m. on February 2, 2026, five-and-a-half months ago. *Id*. at ¶3. This deadline was made available in the Mississippi Code and has been public on the Secretary of State's website since at least December 2025. *Id.* at ¶5.

Two candidates applied by the qualifying deadline for each of the DeSoto County seats created by the challenged laws: Seventeenth Chancery Court District, Place 3 (Subdistrict 17-1) and Twenty-First Circuit Court District, Place Four (Subdistrict 21-1). *See* DeSoto County Website (Ex. 6). Each of the four candidates and their election committees have been actively campaigning in the challenged subdistricts for at least five months, informing their communities that only those voters residing in the subdistricts will have an opportunity to vote for them. *See, e.g.*, Elect Malenda Harris Meacham Facebook Page (Ex. 7) at 4. State and County officials have also been educating voters concerning the same. DeSoto County has published special maps of the subdistricts. *See* Elect John Hughes Facebook Page (Ex. 8) at 12 (containing map of subdistrict published by DeSoto County in January 2026); *see also* [Doc. 3] at 9, ¶36. DeSoto County has also informed voters that the subdistrict races "appear[] only on ballots in select precincts." Ex. 6.

---

[1] The House adopted the conference report on House Bill 1544 by a vote of 78 to 36, and the Senate did the same by a vote of 33 to 8. The Senate adopted the conference report on Senate Bill 2768 by a vote of 38 to 9, and the House did the same by a vote of 76 to 37.

In addition to voter education, the State's and DeSoto County's election machinery is well underway for the November 3, 2026 election, with the election itself effectively beginning on September 4, 2026. Among other things, the Secretary of State has completed its review of all candidate qualifications, including those for the challenged subdistricts, and has determined that the four above-referenced candidates qualify for the two seats. Ex. 1 at ¶¶6, 8, 9.  The Secretary of State has prepared all materials necessary for preparation of the ballots to be sent to the SBEC to approve the ballots, including finalizing sample ballots. *Id.* at ¶10. The SBEC is already in process of scheduling a meeting to rule on candidates' qualifications for all of the State's and counties' offices and judges and to approve the state ballots for the same. *Id.* at ¶18.

The Secretary of State has spent considerable time and effort preparing for the election and the SBEC meeting so that the State can meet its statutory deadlines, the most important of which is September 4, 2026, when the ballots must be finalized and made available in county circuit clerk's offices. *Id.* at ¶21. The 2026 elections begin, for all practical purposes, on that September 4, 2026 deadline—just 46 days from now. *Id*. Simply put, Plaintiffs' changes to the challenged laws are not feasible before the election without significant cost, confusion, and hardship.

## **ARGUMENT**

"A preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008)). The "extraordinary and drastic remedy [is] not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). An injunction of an election law when the election machinery is well underway, as Plaintiffs request here, is even more extraordinary. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). Because, among other things, Plaintiffs chose to

wait until weeks before the election to challenge the year-and-a-half old laws, the injunction factors and Supreme Court precedent require denial of the requested injunction.

I. **Under the modified *Purcell* test, Plaintiffs face a heightened burden, and the State's interests are "extraordinarily strong." The election is 46 days away. Plaintiffs are not entitled to an injunction.**

An injunction would be inappropriate here under the Supreme Court's *Purcell* principle, "a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan.*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (citing *Purcell*, 549 U.S. at 4–5). "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates . . . and voters, among others." *Id.* Thus, the Supreme Court admonishes that "federal district courts ordinarily should not enjoin state election laws in the period close to an election," and it "in turn has often stayed lower federal court injunctions that contravened that principle." *Id.* at 880 (listing cases).

Under the *Purcell* principle, "the traditional test" for an injunction does not apply in the same way when plaintiffs seek "an injunction of a state's election law in the period close to an election." *Id.* The *Purcell* principle "heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.* at 881. Consistent with Justice Kavanaugh's opinion, the Fifth Circuit has recognized that a plaintiff seeking to enjoin an election law shortly before the election bears the following heightened burden:

> (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

7

*La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024) (quoting and applying

Justice Kavanaugh's test from *Merrill*, 142 S. Ct. at 881).

Plaintiffs have not and cannot satisfy this modified test or the standard four-factor

injunction test. Even if this Court assumes that Plaintiffs are "likely to succeed on the merits of

their claims . . . the balance of equities and the public interest tilt[s] against their request for a

preliminary injunction," requiring this Court to deny it. *Benisek*, 585 U.S. at 158.

**II.       The changes Plaintiffs request are not feasible before the election without significant cost, confusion, and hardship. The public interest weighs against an injunction.**

To obtain an injunction under the traditional test, Plaintiffs must make a clear showing

"that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to

defendant; and . . . that granting the preliminary injunction will not disserve the public interest."

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).[2] When any statute is

enjoined, election law or otherwise, "the State necessarily suffers the irreparable harm of

denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Tex.*

*Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).

Here, when election laws may be enjoined, the State and public suffer even more

irreparable harm because "[a] State indisputably has a compelling interest in preserving the

integrity of its election process." *Purcell*, 549 U.S. at 4. Injunctions against election laws,

especially weeks or even months before an election, sacrifice public confidence in elections, and

"[c]onfidence in the integrity of our electoral processes is essential to the functioning of our

participatory democracy." *Id*. "Court orders affecting elections . . . result in voter confusion and

---

[2] When the State is a party, as here, these two factors of the traditional test are one and the same because the State's "interest and harm merges with that of the public." *See, e.g., Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).

consequent incentive to remain away from the polls. As an election draws closer, the risk will only increase." *Id.*

Under the Supreme Court's "bedrock tenet of election law," only in rare cases can a plaintiff "overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Merrill*, 142 S. Ct. at 880–81. The Supreme Court "has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election," it has "often stayed lower federal court injunctions that contravened that principle," and other federal courts routinely refuse to enjoin state election laws under the *Purcell* principle. *Id.* at 880.[3] This principle applies in full in this case. The Court should deny Plaintiffs' requested injunction for several reasons.

*First*, enjoining the challenged laws at this late date would undoubtedly cause "chaos for candidates, campaign organizations, independent groups, [and] … others." *Merrill*, 142 S. Ct. at 880. Plaintiffs state in a footnote in their brief that "the qualifying deadline for all special elections is August 20, 2026." [Doc. 4] at 5, n.4 (emphasis added). But the challenged laws do not call for a *special* election. Instead, as Plaintiffs acknowledge, the subject election qualifying period has been closed for over five months, since February 2, 2026. *Id.* ("The qualifying period is already closed, having opened on January 2, 2026, and closed on February 2, 2026"). And "[t]wo candidates have qualified to run for each seat at issue." *Id.* This admission is extremely important. The four candidates for the two seats— Gwendolyn Baptist, Malenda Harris Meacham, Lucius Edwards and John Hughes—and their campaign committees have been raising

---

[3] *Merrill*, 142 S. Ct. 879 (staying district court injunctions entered 120 days before elections); *Abbott v. LULAC*, --- S. Ct. ---, 224 L.Ed. 2d 525, 2026 WL 1127246 (2026) (reversing district court injunction entered 105 days before primary elections); *Petteway v. Galveston Cnty., Texas*, 87 F.4th 721, 723 (5th Cir. 2023) (staying district court injunction entered 144 days before primary elections); *Veasey v. Perry*, 769 F.3d 890 (5th Cir. 2014) (staying injunction entered nine days before early voting began and 24 days before general election); *Singleton v. East Baton Parish School Bd.*, 621 F. Supp. 3d 618, 629 (M.D. La. 2022) (denying injunction for school board election 87 days away).

and spending money and devoting time to their campaigns since at least February 2, 2026, five-plus months ago.

In the chancery race, according to campaign finance reports filed with the Office of the Mississippi Secretary of State, the Committee to Elect Gwen Baptist has been raising and/or dispersing campaign funds since as early as January 5, 2026, Ex. 1 at ¶12, and has been actively campaigning since, *see* Elect Gwen Baptist Facebook Page (Ex. 9); Elect Gwen Baptist Website (Ex. 10). The committee to elect her opponent, Malenda Harris Meacham, was officially organized on January 8, 2026, Ex. 1 at ¶13; but Ms. Meacham began her campaign informally no later than January 2, 2026, *see* Ex. 7; Elect Malenda Harris Website (Ex. 11). Those campaigns obviously focus on those voters who reside in Chancery Court Subdistrict 17-1. *See e.g.*, Ex. 7 at 3 (Candidate Harris Meacham visiting community event within the subdistrict).

The same is true for the circuit court race. The Committee to Elect John Hughes was organized on January 13, 2026, and has been raising and/or dispersing funds ever since. Ex. 1 at ¶16; Ex. 8; Elect John Hughes Website (Ex. 12). His opponent, Lucian Edwards, and his committee have likewise been campaigning for months. *See* Elect Lucius Edwards Facebook Page (Ex. 13); Elect Lucius Edwards Website (Ex. 14). Like the chancery court campaign, the circuit court candidates have focused on voters residing in the subdistrict. *See, e.g.*, Ex. 8 at 17 (Candidate Hughes attending community gala within the subdistrict).

The candidates are not the only ones whose efforts would be wasted were this Court to enjoin the challenged laws. Even before *Purcell*, this State's District Courts (and Fifth Circuit Judges) recognized that last-minute changes to election law not only burden candidates unduly, but also prevent voters connected with those candidates from exercising their constitutional rights. *See Smith v. Clark*, 189 F. Supp. 2d 503, 510 (S.D. Miss. 2002) (three-judge panel; Jolly, J., presiding). There, the court refused to enjoin state election law because

10

> such an election change would create confusion, misapprehension and burdens for the voters . . . and for the candidates. Many voters want to participate in the election process to a greater extent than mere voting. They want to personally know the candidates, to select their choice, to give money to their selection and *to organize the people in their precincts or counties in the campaign for their choice.*

*Id.* (emphasis added). Because the challenged laws govern judicial races, an injunction against those laws will necessarily cause "chaos" not only for the "candidates" but also the many people serving on their "campaign organizations." *Merrill*, 142 S. Ct. at 880. In Mississippi, judicial campaign organizations are distinctly separate from candidates themselves, and such organizations are required by State law. A judicial "candidate shall not *personally* solicit or accept campaign contributions," but may "establish committees of responsible persons to conduct campaigns for the candidate." Miss. Code of Judicial Conduct, Cannon 5C(2) (emphasis added). Each of these candidates' and their committees' time dedicated and money collected and spent in the past seven months will be wasted if this Court grants Plaintiffs' requested injunction.

*Second*, granting Plaintiffs' requested injunction would cause "voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. It is well documented that the subdistrict candidates have been focusing their campaigns on the subdistrict, the only voters who could cast a vote for them. Candidates have been posting maps and issuing written information to their constituents in their subdistricts about the election and have been explaining who is eligible to vote for whom. *See* Ex. 7 at 4, 7; Ex. 8 at 12; Ex. 13 at 8. The candidates have also been "hitting the streets and spreading the word" in person. *See* Ex. 13 at 4.

State and County officials have also been educating voters. For months the Secretary of State has made information available concerning the challenged laws on its website and

11

otherwise.[4] County officials have likewise been educating voters: "Some judicial positions are elected countywide, while others are elected by specific precincts (subdistricts)." Ex. 6. The County's website lists Candidates Baptist and Harris Meacham for "Subdistrict 17-1" and Edwards and Hughes for "Subdistrict 21-1" and states: "(This race appears only on ballots in select precincts.)" Moreover, the maps that candidates have been using to educate voters in the subdistrict were originally published by DeSoto County on January 15, 2026:



Ex. 7 at 12; *see also* [Doc. 3] at p. 9, ¶36 (similar DeSoto County stamp on map). Of course, if the Court were to enjoin the challenged laws, all of this information distributed by the candidates, their committees, the State, and DeSoto County will be rendered inaccurate, resulting in voter confusion, loss of faith in the judicial process, and failure of voters to show at the polls. The Supreme Court's *Purcell* principle is designed to avoid these negative consequences. *Purcell*, 549 U.S. at 4–5.

*Third*, enjoining the challenged laws would unduly burden election officials, which will in turn only lead to widespread disruption and to unanticipated and unfair consequences for candidates, voters, and others. *Merrill*, 142 S. Ct. at 881. As the Supreme Court has reasoned, courts must avoid changes leading up to an election because elections are complex events:

> [R]unning a statewide election is a complicated endeavor.
> Lawmakers initially must make a host of difficult decisions about
> how best to structure and conduct the election. Then, thousands of

---

[4] *See, e.g.*, Secretary of State Website, https://www.sos.ms.gov/elections-voting/candidate-qualifying-list (List of Candidates).

> state and local officials and volunteers must participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election, and again in counting the votes afterwards. And at every step, state and local officials must communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting.
>
> Even seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences. If a court alters election laws near an election, election administrators must first understand the court's injunction, then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes. It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent.

*Dem. Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavenaugh, J., concurring).

The State's and DeSoto County's preparation for the election has surpassed the point where changes can be made "without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881. The election machinery is well underway at both the State and County level. Again, the qualifying deadline passed five months ago, and the State and County have published information on the qualifying candidates and who can vote for those candidates. Ex. 8 at 12; Ex. 6. The Secretary of State's office has completed its required review of all candidate qualifications for the several hundred candidates running in the November 3 election, including for the Seventeenth Chancery Court District and Twenty-First Circuit Court District. Ex. 1 at ¶6. The Secretary of State has finalized ballots and prepared all materials necessary for preparation of the ballots to be sent to the SBEC for final approval. Ex. 1 at ¶10. The SBEC—which is made up of the Governor, Secretary of State, and Attorney General—is in the process of scheduling a

13

meeting to rule on candidates' qualifications to run for statewide, Supreme Court, Court of Appeals, congressional district, circuit and chancery court district, and other state district offices and to approve the state ballot for such offices. Ex. 1 at ¶18. This substantial work is necessary so that the State can meet its statutory September 4, 2026, deadline for the election to begin with the distribution of ballots. Ex. 1 at ¶21. Given the preparations already made, any "late-in-the-day judicial alterations to state election laws [will] interfere with administration of [the] election and cause unanticipated consequences." *Dem. Nat'l Comm.*, 141 S. Ct. at 31.

*Finally*, other public interests and equities beyond those discussed in *Purcell* also preclude an injunction here. The Legislature passed the challenged laws primarily to increase the number of judges in DeSoto County to account for a population boom. *See, e.g.*, Ex. 2 at 6:08 (6:25:30–6:56:30); Debates on Miss. House Floor, Feb. 6, 2025, [Doc. 3-5], at 4:53:00–5:27:40; Debates on Miss. Senate Floor, Feb. 10, 2025, [Doc. 3-4], at 59:00. The County's massive population growth has resulted in a shortage of judges and a corresponding backlog of cases, and, in the opinion of the bills' proponents, the legislation was necessary because "citizens deserve an efficient and fair access to their courts." Ex. 2 at 6:38 (6:28:21). Enjoining the challenged laws would only prolong the shortage of judges, backlog of cases, and limitation of access to the courts in DeSoto County, causing irreparable harm to the citizens of DeSoto County.

The public interest and equities, consistent with *Purcell*, require the denial of Plaintiffs' request for an injunction and overcome Plaintiffs' alleged showing, or lack thereof, on any other injunction factor.

### III.    Plaintiffs have unduly delayed bringing the complaint to court.

Plaintiffs' request for an injunction fails under the third *Purcell* factor because Plaintiffs have "unduly delayed bringing the complaint to court." *Merrill*, 142 S. Ct. at 881; *see also*

14

*Benisek*, 585 U.S. at 159–61 (denying preliminary relief where plaintiffs waited after adoption of a redistricting plan to seek an injunction because "a party requesting a preliminary injunction must generally show reasonable diligence").

The challenged laws passed the House and Senate by a combined margin of 225 to 90, and the Governor signed them into law on April 23, 2025. Exs. 3 & 4. Debates on judicial redistricting began at least a year before, putting Plaintiffs on clear notice of potential forthcoming policy changes. *See* Ex. 2. However, Plaintiffs chose to file their lawsuit and emergency motion for preliminary injunction on July 2, 2026, a year and a half after the laws were passed. *See* [Docs. 1, 3]. Plaintiffs could have, and indeed should have, filed their lawsuit a year ago so that the Legislature would have the opportunity to consider and, if necessary, revise the allegedly unconstitutional laws during the 2026 session. Barring that, Plaintiffs should have filed the lawsuit sufficiently in advance of the 2026 elections so that the Court could fully consider the issues in sufficient time before the election. Plaintiffs chose not to do either, and now the election machinery has progressed to a point that the public would be substantially harmed were this Court to take any action with respect to the challenged laws before the election.

Any argument that Plaintiffs could not have filed their lawsuit before the United States Supreme Court decided *Callais* falls flat. The Supreme Court's decision in *Callais* "does not change the fact that plaintiffs could have sought a preliminary injunction much earlier." *Benisek*, 585 U.S. at 160. Plaintiffs' Verified Complaint asserts claims under the 14th and 15th Amendments of the United States Constitution, Section 2 of the Voting Rights Act, and Sections 87 and 90 of the Mississippi Constitution of 1890. Only one of Plaintiffs' four claims implicates the new Section 2 evidentiary standards established by *Callais*. Plaintiffs' claim for "Vote Denial Regardless of Race" is based on the one-person-one-vote principle, which is more than 60 years old. *See Gray v. Sanders*, 372 U.S. 368, 381 (1963). Finally, Plaintiffs' claim under Sections 87

15

and 90 of the Mississippi Constitution is based on a 135-year-old textual argument. If the challenged laws were indeed unconstitutional, as Plaintiffs argue, they were so on April 23, 2025 when they were passed, and Plaintiffs should have filed their lawsuit then or early enough to not disrupt an already-in-progress election.[5] Indeed, "[t]he record suggests that the delay [in filing suit] largely arose from a circumstance within plaintiffs' control." *Benisek*, 585 U.S. at 159.

Plaintiffs' delay also deprived the people of Mississippi, acting through their elected legislators, the opportunity to decide for themselves how these elections should proceed. *See, e.g.*, *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988) ("It is now established beyond challenge that upon finding a particular [state] practice . . . to be contrary to either a federal constitutional or statutory requirement, the federal court must grant the appropriate state or local authorities an opportunity to correct the deficiencies"). Had Plaintiffs brought their challenge in a timely manner, the Legislature could have addressed the alleged deficiencies in the laws. In fact, the very first bill the House introduced in the 2026 session was a bill to remedy perceived deficiencies and ambiguities in one of the challenged laws. *See* Bill Tracker H.B. 1 (2026) (Ex. 5).[6] Had Plaintiffs acted diligently, the Legislature could have (with opportunity for input from their constituents) addressed and potentially remedied the alleged constitutional issues with the challenged laws. Now, instead, Plaintiffs seek a last-minute injunction that will cause chaos, voter confusion, and loss of confidence in the integrity of our electoral processes, the maintenance of which is "essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. With only 46 days remaining until official ballots must be provided to the clerk in

---

[5] Even if Plaintiffs needed *Callais* to assert their claims (and they did not), Plaintiffs should have filed their lawsuit in early May after the decision. *See Callais*, 146 S. Ct. at 1311 (decided April 29, 2026). As early as May 5, 2026, Plaintiff Robert Foster asserted his belief that "the Supreme Court [in *Callais*] has made it clear that district lines drawn in such a matter [as the challenged laws] are unconstitutional." *See* May 5, 2026 Letter (Ex. 15).

[6] These amendments were technical in nature and did not change the substance of the challenged laws that were passed in the 2025 session. *See* Miss. Laws 2026, H.B. No. 1, § 1 (Miss. Mar. 17, 2026).

DeSoto County, re-opening registration and qualification for the two new judicial positions, re-tooling the subdistrict to potentially allow at-large voting, and issuing revised ballots with additional candidates is, frankly, impossible.

Given Plaintiffs' failure to file their lawsuit in a diligent manner, this Court should deny the injunction.

IV. **The harm an injunction would cause outweighs any harm the individual-voter Plaintiffs may experience.**

Plaintiffs have failed to establish irreparable harm in the absence of an injunction, and, in any event, any harm Plaintiffs may suffer without an injunction is outweighed by the public harm that would result from an injunction of the election laws at this late date.

"Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). As to irreparable harm, Plaintiffs merely repeat their merits argument and cite a First Amendment case for the proposition that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary." [Doc. 4] at 18 (quoting *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024)). They also cite *Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir. 2016) because it was allegedly "untenable" *in that case* to allow an allegedly discriminatory law to remain in effect for *an* upcoming election. *Id.* at 19. But *Veasey* is distinguishable on multiple fronts and counsels *against* an injunction in this case.

In *Veasey*, the plaintiffs filed a lawsuit on June 26, 2013—17 months before the subject election—alleging the unconstitutionality of election laws, the district court held a nine-day trial on the merits and ruled in 2014 that the laws were unconstitutional and should be enjoined. *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014). But the Fifth Circuit *stayed the injunction for the 2014 election* because it "would change the rules of the election too soon before the election

17

date." *Id*. The Fifth Circuit found the public interest as a whole and "importance of maintaining the status quo on the eve of an election" outweighed any alleged irreparable harm the "individual voter plaintiffs" may have suffered from an election with the allegedly unconstitutional laws. *Id*. at 895-96. This Court should rule the same.

As the Fifth Circuit explained in *Veasey*, it may be "untenable to permit a law with a discriminatory effect to remain in operation" for an election in some circumstances, but it is not "untenable" in every case. *See, e.g., Veasey*, 769 F.3d at 895–96 (requiring election to go forward even after district court found the laws unconstitutional). Otherwise, *Purcell* would not exist. As discussed above, Supreme Court precedent *requires* this Court to forego an injunction to an election law in the weeks leading up to an election. District courts regularly follow the Supreme Court's mandate and allow elections to move forward as planned even when the courts have "grave concern" that election laws are unconstitutional. *See, e.g., McLemore*, 414 F. Supp. 3d at 887.[7] Like those cases and others, the equities and public interest in maintaining the *status quo* outweigh any alleged harm to "individual voter plaintiffs" were the election to proceed without an injunction. *Veasey*, 769 F.3d at 896.

V. **Plaintiffs' success on the merits on all their claims is not "entirely clearcut," as required by the *Purcell* principle, and the merits are not dispositive in any event.**

Plaintiffs' argument for an injunction weeks before the election errantly focuses almost exclusively on the first *Purcell* requirement: Plaintiffs' required showing that "the underlying

---

[7] *See also Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968) (affirming denial of equitable relief and allowing election to continue despite unconstitutional state election law); *Watkins v. Mabus*, 771 F. Supp. 789, 807 (S.D. Miss. 1991), *aff'd in part, vacated in part Watkins v. Mabus*, 502 U.S. 954, 112 S. Ct. 412 (1991) (denying injunctive relief to enjoin district plans that were "doubtless unconstitutionally malapportioned"); *Texas Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, (5th Cir. 2020) (staying district court injunction to minimize voter confusion while merits arguments continued); *Veasey v. Perry*, 769 F.3d 890, 895-96 (5th Cir. 2014) (staying lower court's enjoinment of challenged law because the harm to the State outweighed potential harm to plaintiffs); *Boddie v. City of Cleveland*, 2001 WL 1523854, at *2 (N.D. Miss. April 24, 2001) ("[E]ven where plaintiffs have demonstrated liability on the merits, or a strong likelihood of prevailing, courts typically refuse to enjoin elections at the last minute.").

18

merits are entirely clearcut in favor of the plaintiff." *La Union Del Pueblo Entero*, 119 F.4th at 409 (quoting *Merrill*, 142 S. Ct. at 881); *see also* [Doc. 4] at 1–2, 6–18. But, "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek*, 585 U.S. at 158. Plaintiffs waited to file their lawsuit over a year after the laws were passed and six weeks before the election effectively begins on September 4, when the election machinery has been underway for months. Therefore, the balance of equities and public interest weigh so strongly in favor of allowing the election to move forward that no injunction should issue notwithstanding any merits arguments. In other words, as in *Benisek*, even if this Court assumes that Plaintiffs are "likely to succeed on the merits of their claims, the balance of equities and the public interest tilt[s] against their request for a preliminary injunction," requiring this Court to deny it. *Id.*; *see supra*, Footnotes 3 & 7 (listing cases where courts allowed elections to go forward despite concerns over constitutionality).

But in any event, Plaintiffs' success on all their claims is not "entirely clearcut," as required by the *Purcell* principle. *La Union Del Pueblo Entero*, 119 F.4th at 409 (quoting *Merrill*, 142 S. Ct. at 881). There is no certainty that Plaintiffs will ultimately prevail on their one-person-one-vote claim. The Supreme Court has "held the one-person, one-vote rule inapplicable to judicial elections." *Chisom v. Roemer*, 501 U.S. 380, 402 (1991) (citing *Wells v. Edwards*, 409 U.S. 1973), *aff'g* 347 F. Supp. 453, 454 (M.D. La. 1972)).

Plaintiffs also cite no authority to demonstrate, let alone conclusively, that the laws violate the Mississippi Constitution's provisions governing local and private legislation, and they likely do not. *See* [Doc. 11–13]. First, this claim is barred by sovereign immunity. "Because this request impermissibly asks a federal court to 'instruct state officials on how to conform their conduct to state law,' it is barred by the Supreme Court's decision in *Pennhurst*." *Williams ex rel*

*J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). Moreover, for over one hundred years, the Mississippi Legislature has passed individual statutes to define the number and manner of election of judges for each of the State's counties and judicial districts. *See* Miss. Code Ann. §§ 9-5-1, *et seq.*, 9-7-1, *et seq.* The Legislature is *required* by the Mississippi Constitution to pass judicial redistricting laws every ten years based on criteria that varies from county to county. Miss. Const. Art. VI, § 152. Such laws governing the election of the State's judges must necessarily account for the various needs of the citizens in the different counties and do not conflict with the State's prohibition against "special or local law . . . for the benefit of individuals or corporations." MISS. CONST. Art. IV, § 87. Additionally, and fatal to Plaintiff's claim under Section 87 of the Mississippi Constitution, the challenged laws are not local and private legislation. They are "general" laws, enacted on the legislative timeline for passing general legislation.

Without waiving any potential argument on the merits of *Callais*, a case not even mentioned in Plaintiffs' complaint, the Supreme Court's decision in *Callais* "does not change the fact that plaintiffs could have sought a preliminary injunction much earlier." *Benisek*, 585 U.S. at 160. Based on orders from this Court and others, this inquiry will take time and consideration, which further militates against Plaintiffs' meeting the already high bar they must clear under *Purcell*.

Simply stated, any showing on the merits does not outweigh the State's and public's strong interest in maintaining the *status quo* for the swiftly approaching election. *Union Del Pueblo Entero*, 119 F.4th at 409 (quoting *Merrill*, 142 S. Ct. at 881).

20

**VI.     Plaintiffs' requested remedy is not only unworkable; it is also vague and improper.**

Plaintiffs' requested injunction is impermissibly vague, unworkable as discussed above, and improper from federalism and other perspectives.

Fed. R. Civ. P. 65(d)(1) requires that an injunction "state its terms specifically" and "describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required." Plaintiffs request in their motion that the Court "enjoin Defendants from enforcing H.B. 1544 and S.B. 2768 in the upcoming election in any manner that gives the subdistrict at issue the exclusive franchise to select those two judges . . . and denies every DeSoto Countian living outside the subdistrict the right to vote on those two judgeships." [Doc. 3] at 2. In their brief, Plaintiffs go further and state that the Court should enter "an order setting a special election with a new qualifying period or, at the very least, an order reopening the qualifying deadline for the November 2026 general election with respect to the judicial elections at issue." [Doc. 4] at 6. Plaintiffs never fully explain the full scope and extent of their requested injunction or how they believe the election should proceed as a practical matter.

To the extent Plaintiffs are requesting that the challenged laws be enjoined in their entirety such that there is no election for two additional judges in DeSoto County, then the citizens' right to access the court system will be impeded. This right, and the public's interest in preserving it, far outweighs any harm that would be avoided by an injunction here. As discussed above, the avowed purpose behind the passage of the challenged laws was that those "citizens deserve an efficient and fair access to their courts," and they are being deprived of that access because of crowded dockets and a lack of judges. *See* Ex. 2 at 6:38 (6:28:21).[8] In the

---

[8] Moreover, the Court cannot enjoin the challenged laws in their entirety with respect to DeSoto County because the challenged laws created new districts for DeSoto County (17th Chancery Court

21

Legislature's well-reasoned judgment, the County desperately needs these additional judges. No injunction should issue that deprives the County's citizens of a necessary increase in access to the courts. *See also* [Doc. 3-3] at 1–10 (data showing population and caseload supporting need for judges).

To the extent Plaintiffs are requesting an injunction only as to the part of the challenged laws that requires judges to be elected from within the subdistrict (which is unclear), that request would also be improper. Enjoining only the part of the laws related to the subdistricts, while allowing the elections for the judges to go forward, would mean that this Court must decide, as a matter of policy, that the two judges in the subdistrict should be elected county-wide. There are several issues with that requested remedy.

*First*, as explained in detail above and as a practical matter, the State and County cannot "feasibl[y]" make that change "without significant cost, confusion, or hardship." *Merrill*, 142 S. Ct. at 881. If the judges are to be elected county-wide, all the time and money previously spent by the candidates, their committees, and other concerned voters will have been wasted, and the voter confusion would be unavoidable. At a minimum, candidate qualifying would need to be reopened and all the steps that State and County officials have taken would need to be repeated in the six weeks before the September 4, 2026 deadline for the ballots to be ready. *See* Ex. 1.

*Second*, aside from practical considerations, these are policy decisions that courts are "ill-equipped" to make. *See, e.g., McLemore v. Hosemann*, 414 F. Supp. 3d 876, 887 (S.D. Miss. 2019). To grant an injunction but allow the elections to go forward would require the Court to make a number of policy decisions, among others: (1) whether to hold a county-wide rather than subdistrict-wide vote; (2) whether to open the election up to new candidates or limit the election

---

District and 21st Circuit Court District) when DeSoto County was previously a part of a three-county chancery court district.

22

to candidates who have previously qualified and campaigned in the subdistricts; (3) whether to order a special election; and (4) decide the timing and logistics of the special election. Among other things, the Court's making these decisions would be an "extraordinary departure from the traditional course of relations between the States and the Federal Government," causing the people of DeSoto County to "endure an entire election cycle under a 'federal intrusion into sensitive areas of state and local policymaking.'" *Pettway v. Galveston Cnty., Tex.*, 87 F.4th 721, 725 (5th Cir. 2023) (Olman, J., concurring). The Legislature, not the Court, should have the opportunity to pass on these important policy decisions, which are all the more important after the recent *Callais* decision. *See, e.g., Chisolm*, 853 F.2d at 1189 (stating rule that the Legislature should be extended an "opportunity to correct the deficiencies" before federal intervention).

*Finally*, while an injunction concerning an election law is an extraordinary remedy, ordering a special election or similar remedies is even more extraordinary. *See, e.g.*, *Miss. State Conf. of Nat'l Assoc. for Advancement of Colored People v. State Bd. of Election Commissioners*, 741 F. Supp. 3d 509, 514 (S.D. Miss. 2024) (three-judge panel refusing on July 18, 2024, to order special elections for November 5, 2024). Precedent counsels against such relief and requires the Court to "undertake an 'equitable weighing process' to select a fitting remedy for the legal violations [this court] has identified . . . taking account of 'what is necessary, what is fair, and what is workable.'" *Id.* (quoting *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). The Court should consider: "[1] the severity and nature of the particular constitutional violation, [2] the extent of the likely disruption to the ordinary processes of governance if [requested] elections are imposed, and [3] the need to act with proper judicial restraint when intruding on state sovereignty." *Id.* On balance, as shown, these factors require denial of Plaintiffs' requested relief.

## CONCLUSION

The Court should deny Plaintiffs request for an injunction because an injunction now, six weeks before the election effectively begins, would cause loss of access to justice in DeSoto County courts, voter confusion, loss of confidence in the election system, undue burden on the State's and County's election officials, "chaos for candidates, campaign organizations, [and] . . . others," and other unanticipated and unfair consequences. *Merrill*, 142 S. Ct. at 880. These factors far outweigh any factor in favor of granting an injunction.

Date: July 20, 2026.

Respectfully submitted,

**THE STATE OF MISSISSIPPI, THE STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, LYNN FITCH, and MICHAEL WATSON**

By:     *s/ Samuel C. Kelly*
         One of Their Attorneys

OF COUNSEL:

Samuel C. Kelly (MSB #7496)
skelly@brunini.com
William Trey Jones, III (MSB #99185)
tjones@brunini.com
L. Kyle Williams (MSB #105182)
kwilliams@brunini.com
Jacob A. Bradley (MSB #105541)
jbradley@brunini.com
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
190 East Capitol Street, Suite 100 (39201)
Post Office Box 119
Jackson, MS 39205-0119
Telephone: (601) 948-3101
Facsimile: (601) 960-6902

STEPHEN SCHELVER (MSB #101889)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION

24

Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-3522
Fax: (601) 359-2003
stephen.schelver@ago.ms.gov


*Counsel for the State of Mississippi, The*
*State Board of Election Commissioners, Tate*
*Reeves, Lynn Fitch, and Michael Watson*


<u>**CERTIFICATE OF SERVICE**</u>

I, Samuel C. Kelly, hereby certify that on this day, July 20, 2026, I caused the foregoing

pleading to be electronically filed with the Clerk of the Court using the CM/ECF System, which

will send notification of such filing to all counsel of record and registered participants.



*s/ Samuel C. Kelly*

25