**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

ROBERT FOSTER; KATIE LIGON; KIRBY CARTER; JOHN T. WILLIAMS,

*Plaintiffs*,

vs.

THE STATE OF MISSISSIPPI; THE STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, *in his official capacities as Governor of the State of Mississippi and a Member of the State Board of Election Commissioners*; LYNN FITCH, *in her official capacities as the Mississippi Attorney General and a Member of the State Board of Election Commissioners*; and MICHAEL WATSON, *in his official capacities as the Mississippi Secretary of State and a Member of the State Board of Election Commissioners,*

*Defendants.*

**CIVIL ACTION NO.**
**3:26-CV-00181-SA-JMV**

# INTERVENOR-DEFENDANTS DESOTO COUNTY NAACP AND DELTA SIGMA THETA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

ARGUMENT ............................................................................................................ 5

I. The *Purcell* Doctrine Bars Plaintiffs' Proposed Relief. ........................................ 5

II. Plaintiffs Do Not Challenge the Existence of the Subdistrict and Would Not Be Likely to Succeed If They Did. ........................................................ 11

A. Plaintiffs Do Not Argue That Creation of the Subdistrict Violates the Federal Constitution. ........................................................ 11

B. Plaintiffs Are Not Likely to Succeed in Their Arguments Under the Mississippi Constitution ........................................................ 15

III. To the Extent Plaintiffs are Likely to Succeed and Preliminary Relief Is Not Barred, the Court Must Order Narrow Relief. ........................................................ 16

CONCLUSION ........................................................................................................ 18

## INTRODUCTION

Plaintiffs filed a lawsuit seeking to reconfigure the basic nature of judicial elections in DeSoto County in July of an election year, with candidates already qualified, the election underway, and just over two months before overseas absentee ballots are put in the mail. The relief they seek is barred by *Purcell*, as a mountain of recent redistricting decisions applying the principle confirms. *See, e.g.*, *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025); *see generally Purcell v. Gonzalez*, 549 U.S. 1 (2006). The Court can and should deny preliminary relief—which Plaintiffs could have sought much earlier and inexplicably chose not to—on that basis alone.

Moreover, even if relief were not barred by *Purcell*, Plaintiffs still would not be entitled to the relief they seek. Plaintiffs present no direct evidence that the subdistrict was gerrymandered in a predominately race-based manner, and no argument or evidence that the creation of the subdistrict would not be justified by the Voting Rights Act in any event. Indeed, Plaintiffs' core claim is not about the existence of the subdistrict at all. Rather, they challenge the fact that the current system allows county residents within the subdistrict to vote for four circuit judges and three chancery court judges, while allowing residents in the rest of the county to only vote for three circuit judges and two chancery judges.

Even if Plaintiffs were likely to succeed on the merits in demonstrating that this "extra vote" for subdistrict residents amounted to a constitutional defect, the Court should impose the least intrusive remedy that addresses the defect. *See, e.g.*, *North Carolina v. Covington*, 585 U.S. 969, 979 (2018) (per curiam); *Upham v. Seamon*, 456 U.S. 37, 41–42 (1982). Here, the least intrusive remedy (if any is ordered) is obvious: Have voters in the subdistrict elect one circuit judge and one chancery court judge, and have voters outside the subdistrict elect the rest on an at-large basis. That remedy would completely solve the "extra vote" problem identified by Plaintiffs,

would most closely respect the Mississippi Legislature's configuration of judgeships in DeSoto County and its creation of the subdistrict, and would not require any new qualification processes for candidates or election administrators to deal with. Plaintiffs are not entitled to preliminary relief at all, but if they were, at most, the Court should order relief along these lines.

Importantly, Plaintiffs do not actually attempt to argue that the existence of the subdistrict is itself a problem apart from the "extra vote" issue. They even describe favorably the other subdistricts created for judicial elections in other circuits in Mississippi. Mem. in Support of Pls.' Mot for Preliminary Injunction (Pls.' Mem.) at 9–10, Dkt. No. 4. They cannot show and do not try to show that they are likely to succeed on any constitutional claim on any ground other than the "extra vote" issue.

DeSoto County's Black population has soared in recent years.[1] And because of persistent racially polarized voting, which occurs even in non-partisan elections, fair representation for Black voters requires careful consideration of district lines to ensure compliance with Section 2 of the Voting Rights Act. 52 U.S.C. § 10101; *see also Louisiana v. Callais*, 146 S. Ct. 1131, 1143 (2026) (affirming compelling government interest in Section 2 compliance). Especially in light of the obligations imposed by Section 2, which Plaintiffs never try to claim does not apply here, the Court should deny relief or else order the targeted and limited relief set forth above and in the body of this submission.

[1] Bobby Harrison, *Lawmakers face redistricting reality: Mississippi's non-white population is growing*, Miss. Today (Oct. 12, 2021), https://mississippitoday.org/2021/10/12/mississippi-non-white-population-is-growing-redistricting/ (using Census data to show that non-White population in DeSoto County grew at the highest rate among all of the counties in Mississippi between 2010 and 2020); *see also Harris v. DeSoto Cnty., Miss.*, 813 F. Supp. 3d 674, 690 (N.D. Miss. 2025) (discussing DeSoto County's growing Black population).

## BACKGROUND

The Mississippi Constitution requires that the Mississippi Legislature redraw its circuit court and chancery court districts within five years of each decennial census. Miss. Const. art. 6, § 152. Last year, the Mississippi Legislature completed its judicial redistricting by passing H.B. 1544, which reconstituted the state's circuit courts, and S.B. 2768, which concerned the chancery courts.

As pertinent to this case, Section 38 of H.B. 1544 (codified at Miss. Code Ann. § 9-7-63) designated the 21st Circuit Court District as consisting of DeSoto County. DeSoto County is a majority-White county, Pls.' Mem. at 4–5, with municipalities, including Horn Lake and Southaven, that have large Black populations.[2] The county has seen significant population growth in recent years, particularly in Southaven.[3] DeSoto County has been the subject of voting rights litigation in federal court that stemmed from a lack of electoral districts that give equal opportunity to Black voters in the county to elect their preferred candidates. *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 435–36 (S.D. Miss. 2024); *see also Harris v. DeSoto Cnty., Miss.*, 813 F. Supp. 3d 674, 690 (N.D. Miss. 2025).

Section 39 of H.B. 1544 (codified at Miss. Code Ann. § 9-7-64) provided for three circuit judgeships in the 21st Circuit—all three of which are elected countywide by the voters of DeSoto County. H.B. 1544 § 39, 2025 Reg. Sess., 125th Sess. (Miss. 2025). Section 39 further provided that, starting on January 1, 2027, the 21st Circuit Court would have a fourth judge. H.B. 1544 § 39.

---

[2] U.S. Census Bureau, *QuickFacts, Southaven, Mississippi*, https://www.census.gov/quickfacts/fact/table/southavencitymississippi/INC110224; U.S. Census Bureau, *QuickFacts, Horn Lake, Mississippi*, https://www.census.gov/quickfacts/fact/table/hornlakecitymississippi/BZA210223.

[3] U.S. Census Bureau, *QuickFacts, DeSoto County, Mississippi*, https://www.census.gov/quickfacts/fact/table/desotocountymississippi/PST045225; U.S. Census Bureau, *QuickFacts, Southaven, Mississippi*, https://www.census.gov/quickfacts/fact/table/southavencitymississippi/INC110224.

Unlike the three countywide seats, the fourth judge is to be elected by the voters from a subdistrict (denominated as Circuit Court District 21-1) within DeSoto County, consisting of nine designated precincts: "Horn Lake Central, Horn Lake East, Horn Lake High School*, Horn Lake Intermediate School, Horn Lake North, Horn Lake West, Northwest Community College*, Southhaven [sic] South and Southhaven [sic] West*."[4] *Id.* According to Plaintiffs, the Black Voting Age Population (BVAP) of the subdistrict is 50.52%, while the countywide BVAP is 24.85%. Pls.' Mem. at 4. To DeSoto County NAACP's and Delta Sigma Theta's knowledge, no Black jurist has ever been elected to circuit or chancery court for DeSoto County.

Section 5 of S.B. 2768 (codified at Miss. Code Ann. § 9-5-13) provided for the creation of the Third Chancery Court District, consisting of three chancellors, one of whom is elected countywide by the voters of DeSoto County (with the remaining two chancellors elected from combinations of several other counties). Section 23 further provided that, starting on January 1, 2027, DeSoto County shall be removed from the Third Chancery Court District and assigned its own district, the 17th Chancery Court District, consisting of three chancellors. Two of the chancellors are to be elected countywide from DeSoto County, while the third is to be elected from a subdistrict (denominated as Chancery Court District 17-1) consisting of the same nine precincts as the 21-1 subdistrict for circuit court elections: "Horn Lake Central, Horn Lake East, Horn Lake High School*, Horn Lake Intermediate School, Horn Lake North, Horn Lake West, Northwest Community College*, Southhaven [sic] South and Southhaven [sic] West*."

Nonpartisan elections for circuit and chancery court are currently scheduled for November 3, 2026. Candidates were required to qualify for these elections between January 2, 2026, and

[4] Precincts denoted with an asterisk are split, with the splits defined by a Split Precinct Block List filed with the Secretary of State. S.B. 2768 § 27, 2025 Reg. Sess., 125th Sess. (Miss. 2025).

February 2, 2026.[5] Two candidates—Gwendolyn Baptist and Malenda Harris Meachem—have qualified for the 17-1 Chancery Court subdistrict; and two candidates—Lucius Edwards and John Hughes—have qualified for the 21-1 Circuit Court subdistrict.[6]

More than a year after the passage of H.B. 1544 and S.B. 2768—and more than five months after candidates finished qualifying to run in the subdistricts—Plaintiffs commenced this action, challenging the constitutionality of the subdistricts. *See* Compl. at 16–18, Dkt. No. 1. Plaintiffs also filed, on July 2, 2026, an urgent and necessitous motion for a preliminary injunction. Dkt. No. 3. A hearing has been set for July 31, 2026, Dkt. No. 29, which is less than two months before September 19, 2026, the deadline for absentee ballots to be made available to voters before the November 2026 general election.[7]

On July 16, 2026, DeSoto County NAACP and Delta Sigma Theta filed their motion to intervene to protect the voting rights of the residents of DeSoto County. Separately, a candidate running in the subdistrict has also filed a motion to intervene. Malenda Harris Macham Mot. to Intervene, Dkt. No. 15.

## ARGUMENT

### I. The *Purcell* Doctrine Bars Plaintiffs' Proposed Relief.

The Supreme Court has "repeatedly cautioned that lower federal courts should not 'alter the election rules on the eve of an election.'" *Allen v. Milligan*, 146 S. Ct. 1377, 1381 (2026)

---

[5] Miss. Sec'y of State's Off., *2026 Elections Calendar*, https://www.sos.ms.gov/sites/default/files/elections/2026%20Elections%20Calendar.pdf (last visited July 16, 2026); *see also* Miss. Code Ann. § 23-15-977.

[6] DeSoto Cnty., *2026 Judicial & Federal Candidate Listing*, https://www.desotocountyms.gov/980/2026-Judicial-Federal-Candidate-Listing (last visited July 16, 2026).

[7] Miss. Sec'y of State's Off., *2026 Elections Calendar*, https://www.sos.ms.gov/sites/default/files/elections/2026%20Elections%20Calendar.pdf (last visited July 16, 2026).

(quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam)). That "bedrock tenet of election law," often referred to as the *Purcell* principle, concerns "[l]ate judicial tinkering" that "can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring); *see also Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring). Here, *Purcell* forecloses Plaintiffs' request for injunctive relief, which comes after an inexplicable delay of more than a year, and mere weeks before ballots are to be finalized and distributed.

In redistricting cases, the Supreme Court has repeatedly stayed lower court injunctions issued four to six months before an election. *See, e.g.*, *Robinson v. Callais*, 144 S. Ct. 1171, 1171 (2024) (granting stay on May 15, 2024, in advance of November 2024 election); *Milligan*, 142 S. Ct. at 879 (granting stay on Feb. 7, 2022, in advance of May 2022 primary election); *id.* at 888 (Kagan, J., dissenting) ("The general election is around nine months away; the primary date is in late May, about four months from now."). Indeed, in a recent case involving an injunction against Texas districts, the Supreme Court held that "[t]he District Court improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections," when the primary election was four months away. *See Abbott*, 146 S. Ct. at 419 (granting stay on December 4, 2025, in advance of March primary election); *id.* at 428 (Kagan, J., dissenting) ("Election Day is eleven months from now. Even the primary election . . . is in March."). District courts have denied preliminary relief on *Purcell* grounds due to the same timeline. *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1322 (N.D. Ga. 2022) (applying *Purcell* about three months before primary election).

The relief that Plaintiffs seek falls squarely within the period that the Supreme Court has

characterized, in the redistricting context, to be the "eve of an election." The campaigns for circuit and chancery court in DeSoto County are already more than halfway over, with less than four months between now and the general election on November 3, 2026. As Plaintiffs acknowledge, candidates finished qualifying by the February 2, 2026 deadline, more than five months ago. Pls.' Mem. at 5 n.4. Plaintiffs also note that ballots must be finalized by around August 20, 2026, which is the qualifying deadline for special elections. *See id.* Indeed, absentee ballots must be made available to voters by September 19, 2026, with sample ballots due September 9, 2026, less than two months from now.[8] Despite that, Plaintiffs make no mention of *Purcell* and ask that this Court overhaul the electoral process, eliminate a district that represents minority voters' only opportunity to elect their preferred candidates, and restart the candidate qualifying process—effectively reverting the election process back to square one mere *weeks* before ballots are printed and distributed.

To be sure, a plaintiff can overcome *Purcell* if certain conditions are met—but Plaintiffs cannot do so here. According to the Fifth Circuit, the principle may not preclude injunctive relief "if '(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.'" *La Union del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024) (quoting *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)). For the reasons stated below, Plaintiffs have not shown a likelihood of success—let alone an "entirely clearcut" case—that the subdistrict lines are unconstitutional and must be enjoined (as opposed to

---

[8] Miss. Sec'y of State's Off., *2026 Elections Calendar*, https://www.sos.ms.gov/sites/default/files/elections/2026%20Elections%20Calendar.pdf (last visited July 16, 2026); *see also* Miss. Code Ann. § 23-15-367(3).

the electoral scheme being unconstitutional by allowing voters to participate in an extra election, which can be enjoined without dismantling the subdistrict). *See infra* Sections II and III. Failure to satisfy the first condition alone is sufficient to deny the injunction. *La Union del Pueblo Entero*, 119 F.4th at 409 ("Plaintiffs here fail at the very first step—the merits of their constitutional challenge to S.B. 1 is far from 'entirely clearcut.'").

Nor can Plaintiffs satisfy the second and third conditions. As to undue delay, Plaintiffs acknowledge that H.B. 1544 and S.B. 2768 were signed into law in April 2025, more than a year before this case was filed. The statutes' allegedly defective feature—that a subset of voters in DeSoto County get to participate in more elections than the rest of the county—was obvious on the face of the statutes from the start. Despite that, Plaintiffs waited until candidates have already qualified to run under the existing electoral scheme and have been campaigning for at least five months before "bringing the complaint to court." *See La Union del Pueblo Entero*, 119 F.4th at 409. Plaintiffs' yearlong delay also undercuts any claim of irreparable harm. *See Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536, 546 (5th Cir. 2023) ("Whirlpool's delay in bringing an enforcement action necessarily shows the lack of any such harm."); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").

While Plaintiffs briefly cite the Supreme Court's decision in *Callais*, 146 S. Ct., Pls.' Mem. at 14, that cannot excuse Plaintiffs' belated filing. Any purported constitutional problem is clearly presented in longstanding equal-protection jurisprudence cited throughout Plaintiffs' motion, including *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 627 (1969). Pls.' Mem. at 7–11. In *Kramer*, the Supreme Court held, as Plaintiffs note, that where "a challenged state statute

grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest." 395 U.S. at 627. Thus, Plaintiffs undoubtedly could have brought their case prior to *Callais*.

*Callais* also does nothing to help them prove that the electoral scheme here violates equal protection. In fact, the Supreme Court held in *Callais*, for the first time, that compliance with Section 2 of the Voting Rights Act can constitute a compelling interest. 146 S. Ct. at 1143 ("[T]he time had come to resolve whether compliance with the Voting Rights Act can indeed provide a compelling reason for race-based districting. We now answer that question: Compliance with § 2, as properly construed, can provide such a reason."). And nowhere do Plaintiffs deny that compliance with Section 2 might require the creation of a majority-Black district in DeSoto County (without giving those voters the opportunity to vote in an additional election) to ensure that all voters have an equal opportunity to elect their preferred candidates, because of Black voters' inability to elect preferred candidates countywide. *See generally* Pls.' Mem.

Finally, Plaintiffs have failed to show that their requested remedy will not impose "significant cost, confusion, or hardship" on voters, candidates, and election administrators. *La Union del Pueblo Entero*, 119 F.4th at 409 (quoting *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)). Even if this Court were to immediately grant an injunction after briefing on Plaintiffs' motion is completed on July 24, 2026, Dkt. No. 31, that leaves less than two months before election officials must make absentee ballots available to voters, starting on September 19, 2026.[9] To eliminate an existing district, qualify new candidates, and restart campaigns in a matter

[9] Miss. Sec'y of State's Off., *2026 Elections Calendar*, https://www.sos.ms.gov/sites/default/files/elections/2026%20Elections%20Calendar.pdf (last visited July 16, 2026).

of a weeks is likely to cause voter confusion—and confusion alone may cause voters "to remain away from the polls." *Purcell*, 549 U.S. at 4–5. For instance, voters in the challenged subdistrict may believe, if their district is eliminated, that there is no longer an election to participate in.

According to recent representations that the State Defendants have made in federal court, Plaintiffs' requested relief would likely cause significant disruption. Defendants have explained that judicial elections in Mississippi consistently "run on a 9-month election cycle," starting with candidate qualification in February and ending with Election Day in November. *See* Defs.' Mem. on Remedial Issues at 3, 23, *White v. State Bd. of Election Comm'rs*, No. 4:22-cv-62, Dkt. No. 295 (N.D. Miss. Apr. 25, 2026). They have further indicated that the nine-month cycle aligns with various "laws and regulations on judicial-candidate qualification, campaigns, and campaign finance," including limitations on fundraising, which must occur between time of qualification and 120 days after the election. *Id.* at 4. For judicial elections in particular, candidates must abide by unique limits on their campaigning and fundraising activity, and thus, according to Defendants, a shortened campaign cycle would be unusually disruptive to candidates' ability to run an effective campaign. *Id.* at 24–25. On that basis, the State has opposed any court remedy—even after a post-trial ruling that existing Supreme Court districts violate Section 2 of the Voting Rights Act—that would shorten the election cycle for judicial office from nine months to five months. *Id.* at 23 ("A special election must follow the same 9-month cycle—the 'special' election cannot be held in less than 9 months."). Here, the campaign cycle, even if Plaintiffs' motion were to be granted immediately, would be significantly shorter than the five-month period the State previously opposed *after a trial on the merits*.

For those reasons, *Purcell* precludes Plaintiffs' request for a preliminary injunction, and the Court may resolve the motion on that basis alone.

## II. Plaintiffs Do Not Challenge the Existence of the Subdistrict and Would Not Be Likely to Succeed If They Did.

### A. Plaintiffs Do Not Argue That Creation of the Subdistrict Violates the Federal Constitution.

It is critically important to clarify which aspect of H.B. 1544 and S.B. 2768 Plaintiffs have actually challenged as potentially unconstitutional in their preliminary injunction motion. First, the existence of a subdistrict, by itself, does not present a constitutional problem. As Plaintiffs concede, other judicial districts elsewhere in Mississippi also have subdistricts, and Plaintiffs do not take issue with those. Pls.' Mem. at 9–10. Second, the existence of a majority-Black subdistrict is not inherently unconstitutional either. Rather, as the Supreme Court recently held in *Callais*, a legislature may intentionally create a majority-minority district if required by the Voting Rights Act, because Section 2-compliance constitutes a "compelling interest" justifying the use of race data. 146 S. Ct. at 1143, 1162. Moreover, a legislature's mere awareness of racial demographics when drawing a particular district is not per se evidence of unconstitutional racial gerrymandering. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 22 (2024). This is because "[r]edistricting legislatures will [] almost always be aware of racial demographics" during the districting process so "there is nothing nefarious" about their mere knowledge of race. *Id.* at 22, 37.

In their preliminary injunction motion, Plaintiffs present no evidence showing that racial data was used to intentionally draw the majority-Black district at issue (as opposed to describe the characteristics of the subdistrict after it was already created),[10] nor do they attempt to show that,

[10] Plaintiffs cite Senator Derrick Simmons' remarks in the legislative record to suggest that judicial subdistricts were historically used to provide Black voters with fair representation, Pls.' Mem. at 3 n.3, but they omit that the quote was not about the DeSoto County subdistrict at all and also did not come from the proponents of the legislation. Indeed, the version of S.B. 2768 in existence at that time, February 10, 2025, did not even contain the subdistrict at issue in this case. S.B. 2768, 2025 Reg. Sess., 125th Sess. (as voted on in the Senate on February 10, 2025). Moreover, Senator Simmons voted *against* S.B. 2768 on two occasions, both before and after the DeSoto County

even if it was drawn using racial data, the subdistrict would not be justified by Section 2 of the Voting Rights Act.

Instead, the only potential constitutional problem that Plaintiffs have identified with the challenged electoral scheme is the fact that the residents of the subdistrict are given the opportunity to vote in more judicial elections than the rest of the county—not that a majority-Black subdistrict exists. *See* Pls.' Mem. at 7–11. If necessary, that purported extra-vote issue can be addressed, while still preserving the majority-Black subdistrict, by requiring Defendants to conduct elections in DeSoto County the way they are conducted in other counties with subdistricts: with residents of the subdistrict voting for one member of the circuit court and one member of the chancery court, while residents in the rest of the county elect the other judges of those courts. *See infra* Section III.

Plaintiffs' arguments under federal law can be summarized as follows: Their federal constitutional claims are likely to succeed, because the current scheme allows some DeSoto County residents to vote for four circuit judges and three chancery court judges, while allowing other residents to only vote for three circuit positions and two chancery positions. *See* Pls.' Mem. at 7–11; *see also, e.g.*, *Kramer*, 395 U.S. at 627.[11] They then argue that the only possible

subdistrict was added. S.B. 2768, 2025 Reg. Sess., 125th Sess. (as voted on in the Senate on April 2, 2025, and as enacted); *Roll Call: MS SB 2768 | 2025 | Regular Session*, LegiScan, https://legiscan.com/MS/rollcall/SB2768/id/1535098 (last visited July 14, 2026). These general remarks are of little relevance to this case, because evidence of racial predominance in districting must be specific to the district challenged. *See Alexander*, 602 U.S. at 33 ("A state-wide analysis cannot show that District 1 was drawn based on race."). Additionally, Plaintiffs' citation to general opposition expressed by ACLU of Mississippi is even less probative as to the Mississippi Legislature's intent. *See* Pls.' Mem. at 15 & n.10

[11] Notably, however, Plaintiffs do not cite or discuss Fifth Circuit case law regarding when certain county residents can vote in elections from which they have been excluded. *See Creel v. Freeman*, 531 F.2d 286, 288 (5th Cir. 1976) ("The facts of this case clearly show a substantial interest of Jasper and Carbon Hill residents in the operation of the Walker County school system and do not show domination by such residents over county school board elections.").

justification for this scheme is race and that this would not be a permissible justification for the scheme. Pls.' Mem. at 14–18.

Nothing about Plaintiffs' core constitutional argument under *Kramer* challenges the *existence* of subdistricting as a general practice. Indeed, Plaintiffs acknowledge that subdistricts, when voters in each district are allowed to vote in parallel and elect a candidate to represent each subdistrict, "typically protect[] citizens' voting strength" and are "permissible." Pls.' Mem. at 9–10. Plaintiffs even highlight "the Sixth Circuit Court District, which is divided into three subdistricts," as an example of lawful subdistricting, because it does not give an "extra" vote to any subdistrict's residents. *Id.* at 10. And while Plaintiffs claim that the voters in the subdistrict here receive greater "weight[]," Pls.' Mem. at 8 (citing *Gray v. Sanders*, 372 U.S. 368, 379 (1963), and *Reynolds v. Sims*, 377 U.S. 533, 563 (1964)), the principle of one-person-one-vote does not apply to judicial elections. *See Chisom v. Roemer*, 501 U.S. 380, 402 (1991) ("[W]e have held the one-person, one-vote rule inapplicable to judicial elections."). Thus, the subdistrict at issue may raise constitutional questions due to receiving an extra vote, but it cannot be challenged (and is not challenged) simply because of any population imbalance between the subdistrict and the rest of the county.

Plaintiffs also have not shown that race or racial considerations impermissibly motivated the decision to give some residents an "extra" vote or the creation of the subdistrict at issue. While they allege in conclusory terms that H.B. 1544 and S.B. 2768 were "[r]acially motivated," Compl. ¶ 10, Dkt. No. 1, Plaintiffs never point to anything in the legislative record to explain why judicial elections in DeSoto County allow subdistrict residents to also vote for the countywide positions. And indeed, given the fact that no other circuit has this issue, the reason may simply be a drafting error or an inadvertent mistake in the legislative process while adding the extra judgeships in

growing DeSoto County. Moreover, Plaintiffs do not make any serious attempt to challenge the legislature's decision to create the subdistrict in the first place (as opposed to the apparent decision to assign subdistrict residents a vote for the at-large positions), but even if they did, such a challenge would not be likely to succeed on this threadbare record.

Creating opportunity districts for Black voters is a permissible and indeed compelling government interest where necessary to ensure compliance with Section 2 of the Voting Rights Act. *Callais*, 146 S. Ct. at 1143, 1162. As this Court previously explained, determining whether and how Section 2 applies is complex and typically "requires 'an intensely local appraisal of the design and impact of the contested electoral mechanisms,'" aided by multiple experts in geography and mapping as well as quantitative political science methods. *White v. State Bd. of Election Comm'rs*, 795 F. Supp. 3d 794, 831 (N.D. Miss. 2025) (quoting *Miss. State Conf. of NAACP*, 739 F. Supp. 3d at 442), *vacated and remanded*, No. 25-60506, 2026 WL 1340213 (5th Cir. May 11, 2026). Whether Section 2 applies depends on whether, among other things, it is possible to create a compact, reasonably configured Black-majority district through race-blind mapping techniques which comports with the state's legitimate districting criteria, and whether there is racially polarized voting that cannot be explained solely based on partisanship which results in Black voters being unable to elect candidates of choice on an equal basis with Whites. *See Callais*, 146 S. Ct. at 1159–60; *accord Allen v. Milligan*, 599 U.S. 1, 18–19 (2023); *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986).

Plaintiffs offer none of that evidence. They do not argue that it was not possible to draw a compact, Black-majority subdistrict. They do not argue that elections in DeSoto County are not racially polarized. They do not argue that Black voters in DeSoto County would have an equal opportunity to actually elect judges to the circuit and chancery courts in county-wide at-large

elections. Indeed, the Mississippi Legislature *did* draw a compact Black-majority subdistrict, mostly out of whole precincts. Plaintiffs never claim that racial data was even used in the configuration of this particular subdistrict and acknowledge that "the origins of [the] subdistrict" are unclear. *See* Pls.' Mem. at 3 n.3. The existence of racially polarized voting in Mississippi that cannot be explained purely based on party, as courts have repeatedly found such polarization, including in non-partisan judicial elections. *See White*, 795 F. Supp. 3d at 823–25 (finding that Black and White Mississippians vote for opposing judicial candidates); *see also Miss. State Conf. of NACCP*, 739 F. Supp. 3d at 441, 435–36. And Plaintiffs seem to concede that a subdistrict is necessary to provide Black DeSoto residents an opportunity to actually elect judges of their choice to the circuit and chancery courts. *See* Pls.' Mem. at 15–16.

Thus, the constitutionality of any potential racial considerations and the mere existence of the subdistrict are largely irrelevant to Plaintiffs' claims, and they certainly do not contribute to any likelihood of success on the merits in light of Plaintiffs' failure to make any showing regarding the Section 2 standard. Rather, Plaintiffs' likelihood of success, if any, stems entirely from the "extra vote" issue under *Kramer*.

### B. Plaintiffs Are Not Likely to Succeed in Their Arguments Under the Mississippi Constitution

Plaintiffs also claim (Pls.' Mem. at 11–13) that the subdistrict violates the Mississippi Constitution. That claim is unlikely to succeed for two independent reasons. First, the claim is barred by the State's sovereign immunity. The Supreme Court has long held that the exception permitting suits against state officials for ongoing violations of *federal* law does not extend to claims that state officials are violating *state* law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 117–21 (1984). Accordingly, "a federal court [may not] 'instruct[] state officials on how to conform their conduct to state law.'" *Williams On Behalf of J.E. v. Reeves*, 954 F.3d 729,

739 (5th Cir. 2020) (quoting *Pennhurst*, 465 U.S. at 106). Here, Plaintiffs ask this Court to enjoin the State of Mississippi, the State Board of Election Commissioners, and various state officials from conducting elections under the judicial districts established by H.B. 1544 and S.B. 2768 because those districts allegedly violate the Mississippi Constitution. *See* Compl. ¶¶ 69–74, Dkt. No. 1. Because Plaintiffs seek to compel state officials' compliance with state law, *Pennhurst* forecloses their claim.

Second, the claim is unpersuasive on its own terms. Plaintiffs contend that H.B. 1544 and S.B. 2768 are unconstitutional "special" or "local" laws enacted for the benefit of a discrete group of voters in violation of Sections 87 and 90 of the Mississippi Constitution. But the Mississippi Constitution expressly entrusts the Legislature with broad authority to establish judicial districts. *See* Miss. Const. art. 6, § 152. And Plaintiffs concede (Pls.' Mem. at 10) that the Legislature has long employed judicial subdistricts in circuit court elections. Yet they identify no Mississippi decision holding that the creation of a judicial subdistrict constitutes prohibited private legislation. That silence is telling. Against that backdrop, Plaintiffs ask this Court to adopt a novel interpretation of the Mississippi Constitution that would call into question longstanding features of Mississippi's judicial-election system. They are not likely to succeed on such an unprecedented claim.

## III. To the Extent Plaintiffs are Likely to Succeed and Preliminary Relief Is Not Barred, the Court Should Order Narrow Relief.

It is axiomatic that equitable relief should be no broader than necessary to remedy the violation established. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established."); *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (courts must "try not to nullify more of a legislature's work than is necessary"). That principle applies in redistricting cases, where courts

must respect the Legislature's primary role in designing electoral systems. *See Covington*, 585 U.S. at 979 (per curiam). Thus, when fashioning a remedy, courts should select an approach that respects the State's enacted plan while completely remedying the identified defect. *Upham v. Seamon*, 456 U.S. 37, 41–42 (1982) (citing *White v. Weiser*, 412 U.S. 783, 797 (1973)); *see also Perry v. Perez*, 565 U.S. 388, 393 (2012) ("[A] district court should take guidance from the State's recently enacted plan in drafting an interim plan."); *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 782 F. Supp. 3d 349, 357 (S.D. Miss. 2025), *vacated on other grounds and remanded sub nom. Bd. of Election Comm'rs v. NAACP*, No. 25-234, 2026 WL 1377105 (U.S. May 18, 2026). Once the violation is remedied, the court's role in the "districting process [is] at an end." *Covington*, 585 U.S. at 979.

Here, assuming Plaintiffs could establish a federal constitutional violation under *Kramer*, the only cognizable harm they identify is their contention that residents of the subdistrict participate in more judicial elections than residents outside the subdistrict. Pls.' Mem. at 9. That alleged harm does not require eliminating the subdistrict altogether. It can be completely remedied by requiring residents of the subdistrict to elect the circuit and chancery judges assigned to the subdistrict, while allowing the remaining DeSoto County voters to elect the remaining judges on a countywide basis. Plaintiffs themselves effectively concede that this approach would remedy their alleged injury. *See* Pls.' Mem. at 17–18.

This limited remedy would also avoid the substantial disruption caused by Plaintiffs' requested relief. Plaintiffs ask the Court to eliminate the subdistrict altogether and replace the Legislature's chosen electoral structure with a judicially imposed countywide system, including new qualification deadlines. That remedy would not merely address the alleged disparity Plaintiffs identify; it would fundamentally alter the State's judicial-election framework and dismantle a

structure that provides meaningful representation for DeSoto County's growing Black population. The narrower remedy described above would avoid those consequences by preserving the Legislature's decision to create a subdistrict while correcting only the alleged defect Plaintiffs identify. It would also serve the State's interest and the strong public interest in ensuring compliance with the Voting Rights Act and maintaining a system that provides all Mississippians, including Black citizens of DeSoto County, with an equal opportunity for representation.

Accordingly, if the Court grants any preliminary relief at this late stage, the proper remedy is not to invalidate the subdistrict but, at most, to require the limited adjustment necessary to eliminate the alleged disparity in judicial elections.

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied on *Purcell* grounds, or alternatively, this Court should enter a limited injunction providing that the voters residing in the subdistrict shall be permitted to vote only for the circuit and chancery court races in that subdistrict, and not in the countywide judicial races, in the upcoming elections for the 21st Circuit Court and the 17th Chancery Court.

Respectfully submitted,

This the 29th day of July 2026

/s/ *Joshua Tom*________________________
Joshua Tom (Miss. Bar No. 105392)
AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION
101 South Congress Street
Jackson, MS 39201
(601) 354-3408
*JTom@aclu-ms.org*

Carroll Rhodes, MSB 5314
LAW OFFICES OF CARROLL RHODES
PO Box 588
Hazlehurst, MS 39083
(601) 894-1464
*crhodes6@bellsouth.net*

*Attorneys for Intervenors DeSoto County NAACP and Delta Sigma Theta Sorority, Inc.*

**CERTIFICATE OF SERVICE**

I, Joshua Tom, hereby certify that on July 29, 2026, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all parties on file with the Court.

*/s/ Joshua Tom*
Joshua Tom