**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**ROBERT FOSTER; KATIE LIGON; KIRBY CARTER; and JOHN WILLIAMS** — **PLAINTIFFS**

**VS.** — **CIVIL ACTION NO.: 3:26-CV-181-SA-JMV**

**THE STATE OF MISSISSIPPI; THE STATE BOARD OF ELECTION COMMISSIONERS; TATE REEVES, in his official capacities as Governor of the State of Mississippi and a Member of the State Board of Election Commissioners; LYNN FITCH, in her official capacities as the Mississippi Attorney General and a Member of the State Board of Election Commissioners; and MICHAEL WATSON, in his official capacities as the Mississippi Secretary of State and a Member of the State Board of Election Commissioners** — **DEFENDANTS**

---

**DEFENDANTS' POST-HEARING BRIEF**

---

The State of Mississippi, the State Board of Election Commissioners ("SBEC"), and Governor Tate Reeves, Attorney General Lynn Fitch, and Secretary of State Michael Watson, all in their official capacities ("Defendants"), submit this post-hearing brief in opposition to Plaintiffs' motion for preliminary injunction. *See* [Docs. 3, 4].

## INTRODUCTION

As of today, August 8, 2026, **27 days** remain until the sample ballot must be finalized, **42 days** until UOCAVA voting begins at "noon on Saturday, September 19th," **44 days** until in-person absentee voting begins at 8 a.m. on Monday, September 21, 2026, and **87 days** until the election ends on Tuesday, November 3, 2026. Those statutory deadlines must be met. Those deadlines alone bar preliminary relief, and the remaining *Purcell* factors independently require the same result. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006)).

*Purcell* and its four-part test squarely apply to Plaintiffs' request for injunctive relief. The Supreme Court recently applied *Purcell* to stay the injunction of an election eleven months before election day. *See Abbott v. League of United Latin Am. Citizens* ("LULAC 2025"), 146 S. Ct. 418 (2025). The Fifth Circuit has applied *Purcell* similarly. *See, e.g.*, *Petteway v. Galveston Cnty.*, 87 F.4th 721 (5th Cir. 2023) (staying injunction entered two weeks before candidate qualifying deadline when early voting was three months away and primary election was approximately 144 days away). The *Purcell* doctrine precludes Plaintiffs' request for a preliminary injunction. The Court should end its analysis there.

Setting aside for a moment Plaintiffs' delay in bringing this suit, no preliminary injunction can issue here without significant cost, confusion, and hardship to the State, voters, and candidates. It is undisputed that the Secretary of State's office must distribute the sample ballot, identifying all qualified candidates, by September 4, 2026 (**<u>27 days from today</u>**). Voting begins at noon on Saturday, September 19, 2026 (**<u>42 days from today</u>**); in-person voting begins on Monday, September 21, 2026 (**<u>44 days from today</u>**); and election day itself is **<u>87 days</u>** away. It is also undisputed that candidates have been campaigning with significant financial and time investments since at least January 2, 2026 (**<u>for more than seven months</u>**). Both candidates and DeSoto County have been educating voters on the upcoming races and the subdistrict since January 2026. It is undisputed that candidates have focused their efforts on the challenged subdistrict, expended significant time and money to campaign there, and would suffer substantial cost and hardship if an injunction were to issue. Plaintiffs have put on no evidence that demonstrates their requested relief could be implemented without significant cost, confusion, and hardship to all stakeholders.

Moreover, Plaintiffs unduly delayed bringing this lawsuit, and under *Purcell*, that delay bars the relief they seek. The challenged laws were signed by the Governor on April 23, 2025 (**<u>fifteen months before the lawsuit was filed</u>**). Plaintiff Foster testified he knew and was

concerned about the challenged laws by at least July of 2025 (**one year before the lawsuit was filed**). TR at 400:10-15; 401:9-18. Plaintiffs' explanations for the timing cannot establish the diligence *Purcell* requires.

Further, Plaintiffs' likelihood of success on all their legal claims is not "entirely clearcut," which is required to obtain relief under *Purcell*. As Defendants have previously briefed, Plaintiffs' Count I cannot lie because the Supreme Court has ruled that the one-person-one-vote rule does not apply to judicial elections, *see* Defendants' Brief [Doc. 43] at 19 (quoting *Chisom* and *Wells*). Plaintiffs have cited no authority to the contrary, *see* Plaintiffs Reply Brief [Doc. 50]. The Court has explained that Plaintiffs' Count II is "particularly unsuited for resolution" at this preliminary injunction stage. *See* [Doc. 57] at 10 (explaining this claim "require[s] a fact intensive examination of the record"). And Plaintiffs have now abandoned their Mississippi Constitution claim (Count III). For these additional reasons, the Court should not issue an injunction.

Plaintiffs have also failed to show they would suffer irreparable harm in the absence of an injunction. Plaintiffs' primary argument for irreparable harm (that they have less of a vote for judges in DeSoto County than other citizens) is tied to their one-person-one-vote claim, which again does not apply in this case as a matter of law. Plaintiffs' remaining harm arguments are insufficiently supported on this record and fail to establish irreparable harm required for injunctive relief. Indeed, the evidence establishes that any alleged harm to the individual-voter Plaintiffs (if an injunction does not issue) is outweighed by the harm to the State and its citizens (if an injunction does issue).

Finally, it's noteworthy that Plaintiffs here request extraordinary relief: redrawing district lines, reopening qualifying deadlines, and potentially ordering a special election less than 44 days before voting begins. Plaintiffs have cited no precedent (and Defendants have not identified a case) in which a federal court ordered such relief *either* this close to an election *or* on a preliminary-

injunction record like the one before the Court here. This would be an "extraordinary departure from the traditional course of relations between the States and the Federal Government." *Petteway*, 87 F.4th at 725 (Oldman, J., concurring). And at any rate, the governing authorities counsel the Court to afford the Legislature the first opportunity to address these policy choices. *See, e.g., Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988). If the Court stays the November 3rd election, which it should not, the Legislature, not the Court, must be given the opportunity to pass on the important policy decisions of how the district lines should be redrawn and when a special election should be held.

For all of these reasons, Defendants request that the Court deny the injunction.

## BACKGROUND

H.B. 1544 and S.B. 2768 were presented to the full Mississippi Legislature in early February 2025 and signed by the Governor on April 23, 2025. D-3 (Bill Tracker H.B. 1544); D-4 (Bill Tracker H.B. 2768). The challenged laws represented a comprehensive redistricting of the State's circuit and chancery court districts. *See* P-1 (H.B. 1544); P-2 (S.B. 2768). The Mississippi Constitution required the Legislature to redistrict, specifically to "establish certain criteria by which the number of judges in each district shall be determined, such criteria to be based on population, the number of cases filed and other appropriate data." Miss. Const. Art. 6, § 152. The Legislature explicitly re-codified the criteria considered in the challenged laws themselves:

> (a) The population of the district;
>
> (b) The number of cases filed in the district;
>
> (c) The caseload of each chancellor in the district;
>
> (d) The geographic area of the district;
>
> (e) An analysis of the needs of the district by the court personnel of the district; and
>
> (f) Any other appropriate criteria <u>as determined by the Legislature</u>.

P-1 at 3-4 (lines 76-83); *see also* P-2 3-4 (lines 75-85).

Plaintiffs filed this lawsuit and an "urgent and necessitous" motion for preliminary injunction on July 2, 2026, to challenge the constitutionality of the 2025 laws, over fifteen months after the laws were signed into law. *See* [Doc. 1]; [Docs. 3, 4] (urgent and necessitous motion); P-1 (H.B. 1544); P-2 (S.B. 2768). Plaintiffs assert three claims. In Count I, Plaintiffs allege a one-person-one-vote claim "regardless of race." [Doc. 1] at ¶¶44-53. In Count II, Plaintiffs assert they are denied the right to vote "based on race" under the Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the Voting Rights Act. *Id.* at ¶¶54-68. In Count III, Plaintiffs assert that the challenged laws violate the Mississippi Constitution as improper local and private legislation. *Id.* at ¶¶69-74.

Defendants responded in opposition to Plaintiffs' motion for preliminary injunction on July 20, 2026 with thorough briefing and over a dozen supporting exhibits. *See* [Docs. 42, 43].[1]

On July 31 and August 3-5, 2026, the Court held a four-day evidentiary hearing on Plaintiffs' motion. The Court heard opening statements, testimony from eight witnesses, and closing arguments from counsel for Plaintiffs, Defendants, Intervenor Defendant Malenda Meacham, and Intervenor DeSoto County NAACP and Delta Sigma Theta Sorority ("Organizational Intervenors"). A summary of the testimony follows:

<u>Representative Daniel Eubanks</u> – Rep. Eubanks testified he has been a member of the Mississippi House of Representatives since before the challenged laws were debated and ultimately passed in early 2025. He testified there was "a lot of discussions among the DeSoto caucus about" the challenged laws. TR at 48:3-15. He testified he had "concerns" about the subdistrict, *id.* at 50:5-6. However, he and the other members of the DeSoto caucus voted for the

[1] Defendants incorporate by reference all arguments, authorities, and exhibits made in their memorandum in opposition to Plaintiffs' motion for preliminary injunction. *See* [Docs. 42, 43].

bills each time they were presented and did not speak against or otherwise take legislative action opposing the bills. *See* Vote Counts D-23, D-25, D-31. Rep. Eubanks testified that he discussed the challenged laws with Plaintiffs Robert Foster and Katie Ligon shortly after the bills were signed into law in April 2025. TR at 133:6-9.

<u>Ruth Ann "Sissy" Ferguson</u> – Sissy Ferguson is an election commissioner in DeSoto County. Ms. Ferguson is responsible for printing election day ballots to be used on November 3, 2026. She testified that she orders the election day ballots in early October. TR at 255:18-21. However, Ms. Ferguson is not responsible for *absentee* ballots. TR at 265:4-7. She testified that *absentee* ballots must be prepared by 8 a.m. on Monday, September 21, 2026. TR at 255:25-256:2. (It is undisputed that, as DeSoto County publishes on its website, voting begins at 8 a.m. on Monday, September 21, 2026, two days after the statutory deadline of September 19, which is a Saturday. *See* D-34 (DeSoto County election website stating: "**September 19**: Absentee In-Person Voting Begins" and "In-Person Absentee Voting Hours starting September 19, 2026" "Monday-Friday").

<u>Plaintiff Katie Ligon</u> – Ms. Ligon testified to a number of relevant dates and events:

- April 23, 2025 – The Governor signed the challenged laws. TR at 220:9.
- April 23, 2026 – The Governor issued a proclamation ordering a special session in light of *Callais* "for the sole and exclusive purpose" of considering Supreme Court districts and did not call a session for the DeSoto County judicial districts.[2] *Id.* at 223-24; D-33.
- May 5, 2026 – Plaintiff Foster and other supervisors sent a letter to the Governor demanding a special session to consider the DeSoto County judicial districts. Plaintiff Foster stated "[i]t is imperative for all parties involved that this issue be addressed <u>**immediately**</u>." D-28 (emphasis added). Foster did not receive his requested relief. TR at 228:17-23.
- July 2, 2026 – Plaintiffs filed their lawsuit "more than a year after the laws were signed by the governor in April 2025." TR at 230:19-22.

---

[2] *See Louisiana v. Callais*, 146 S.Ct. 1131, 1152 (2026).

- September 19, 2026 – Voting begins: "Q. As we sit here today on August 3, 2026, we are currently six weeks until absentee voting begins on September 19, 2026? Are you aware of that? A. Yes." TR at 231:6-9.

Ms. Ligon also testified she did not "recall having a conversation with Representative Eubanks" concerning the challenged laws in 2025. TR at 219:2-9.

Judith Wammack – Ms. Wammack is a GIS analyst employed by DeSoto County. Plaintiffs retained her to draw maps of the subdistricts for purposes of this litigation. She testified that one of her primary duties is drawing maps requested by the County and members of the public, including for elections. TR at 314:19. She first learned of the challenged laws on January 5, 2026, when candidate Malenda Meacham requested that Ms. Wammack provide a map of the subdistrict. TR at 278:25-279:8. Neither Plaintiff Foster nor anyone else had asked Ms. Wammack for a map before that time. Wammack gathered the information necessary to create a map and provided a map of the subdistrict to Ms. Meacham within 24 hours of her request. TR at 290; *see also* TR at 843:10-12. Ms. Wammack also testified that her colleague Rob Winkler created a map for circuit court candidate John Hughes in January 2026. TR at 318-19. She testified these maps of the subdistrict created by her office are on the Facebook pages for both candidates Meacham and Hughes, and the Court admitted those pages into evidence. *See* D-8; D-12. Ms. Wammack testified that she created four additional maps of the subdistrict for other requestors and that those individuals are "using" those maps. TR at 320:23; 321:18. She testified that if the Court enters an injunction the "maps [she] previously submitted will be inaccurate as it pertains to how the election will move forward -- in 2026." *Id.* at 321:9-13. She also testified that she created a map for Plaintiffs in the two hours before her testimony, at their request. TR at 301:25.

Robert Foster – Supervisor Foster testified that he knew and was concerned about the challenged laws no later than July of 2025. TR at 400:10-15; 401:9-18. (The Board of Supervisors'

official Minutes confirm the Board discussed the appointment of new judges in April, June, and July of 2025. *See* DM-4, DM-5 and DM-6.).

Supervisor Foster testified that he was "confused" about the challenged laws because he could not obtain a map of new subdistrict. TR at 525:15-18. (This testimony was rebutted by Ms. Wammack's testimony that she works in the Board of Supervisors' building, supplied Meacham a map in less than a day, and created a map for Plaintiffs in the two hours before her testimony. TR at 301:25.)

Supervisor Foster testified that he has been recruiting individuals to run against Candidates Meacham, Baptist, Hughes, and Edwards in hopes that this Court would enter an injunction and that a new qualifying deadline would be set. TR at 502. Foster testified that he recruited Beth Owens and Jody Neyman, two candidates who have been campaigning county-wide for the past seven months. *See* TR at 502:13; D-7 (listing Owens as candidate for countywide Chancery, Place 2, and Neyman as candidate for countywide Circuit, Place 1).

<u>Laura Henderson-Courtney</u> – Ms. Henderson-Courtney is the Senior Attorney and acting Assistant Secretary of State for the Elections Division of the Mississippi Secretary of State. TR at 533:7. Ms. Henderson-Courtney testified consistently regarding the dates and processes for the upcoming election, including that the statutory deadline by which the SBEC must approve and send the sample ballot is **<u>September 4, 2026</u>** (60 days before the November 3, 2026 election and **<u>27 days</u>** from today). TR at 586:4-5. She testified the SBEC must, by necessity, meet before September 4 to approve the candidates for the sample ballot and that the meeting is scheduled for August 25, 2026 (**<u>17 days</u>** from today). TR at 571:25-572:14. She testified that "absentee ballots must be made available in county circuit clerks' offices on or before **<u>September 19th, 2026</u>**, 45 days before the general Election Day, the same date on which absentee ballots must be mailed to all voters who applied for an absentee ballot before such ballots are available." TR at 594:7-13.

She testified that, because September 19 falls on a Saturday, voting will begin on Monday, September 21, 2026 (**44 days** from today). TR at 602.

Ms. Henderson-Courtney likewise authenticated the certificates of organization and campaign finance disclosure documents for each of the four candidates for Chancery Place 3 and Circuit Place 4. *See* D-18, D-20, D-21, and D-22. Each of the four candidates qualified with the Secretary of State's office in January 2026. *Id.* Each of their campaign committees has since disclosed money obtained and spent since January 2026. *Id.* Moreover, Ms. Henderson-Courtney explained that candidate Malenda Meacham's *personal* campaign finance disclosure shows that Meacham reported she *personally* expended $14,699.91 on her campaign as of July 8, 2026, *i.e.* money out of Meacham's own pocket. *See* D-19 at 9.[3]

Brandi Johnson – Ms. Johnson is a deputy circuit clerk for DeSoto County. She is responsible for administering the State Elections Management System ("SEMS") for DeSoto County, including creating a list of all voters eligible to vote for Chancery Court Place 3 and Circuit Court Place 4 under the challenged laws. TR at 732:9-11; 734:5-8. Ms. Johnson testified that Ms. Meacham requested that voting list in December 2025 (eight months ago), and Johnson provided the list, including identification of the precincts where the individuals on the list would vote, in less than a day. TR at 769:1-770:2; DM-16. Ms. Johnson also sent voter lists to other candidates in January 2026.[4] She further testified that ballots for voters eligible under the Uniform and

[3] During the hearing, Plaintiffs criticized the 2025 statute's use of precinct names that had been changed by DeSoto County in 2022, purportedly contributing to the Plaintiffs' confusion. But the names of specific voting precincts have no bearing on the location of the subdistrict's lines. Indeed, Ms. Henderson-Courtney confirmed that the subdistrict map that Ms. Wammack created in January 2026 "never changed." TR at 657:16-18. The precinct name issue is irrelevant. In any event, Senate Bill 2768 expressly states that in the event of ambiguities concerning "the description of a district as provided in House Bill 1544 and [Senate Bill 2768] and . . . the official map of the judicial districts . . . the applicable map shall control." TR at 700:8-16; P-2 at 34-35 (lines 836-844).

[4] Ms. Meacham testified she has used her subdistrict voter list provided by Ms. Johnson "for purposes of canvassing" in her subdistrict-focused campaign. TR at 812:18.

Overseas Citizens Absentee Voting Act must be sent by "noon on September 19th," **42 days** from today. TR 755:6-11.

Intervenor Candidate Malenda Meacham – Ms. Meacham testified to the extensive campaign efforts that she, her opponent, and circuit court candidates have made since January 2026. She testified to the substantial efforts she and other candidates have made in their race for election in the subdistrict; the voter education she and others have undertaken concerning the new subdistrict; and the significant cost, confusion, and hardship that would result in the event an injunction is issued. She testified that she has focused her campaign on the subdistrict since at least January 2, 2026, so enjoining the election would impose substantial hardship and create significant voter confusion. TR at 833:20-21 ("voters are going to be confused"); 843:16-844:845:1. She testified it may not be possible for her to continue running if this Court grants Plaintiffs the relief they request. TR at 833:13-17 ("all of my efforts thus far would be severely minimized. I would have to revamp my whole entire campaign strategy. . . . I don't even know how that's possible.").

## ARGUMENT

### I. The *Purcell* doctrine, and its heightened injunction test, applies to preclude the requested injunction.

The *Purcell* doctrine—originally stated in the Supreme Court's 2006 decision and refined and strengthened since then—holds that "federal district courts ordinarily should not enjoin state election laws *in the period close to an election*." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (collecting cases) (emphasis added). *Purcell* recognized "a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Id.* at 881 (quoting *Purcell*, 549 U.S. at 4–5). *Purcell* "heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.*

Under *Purcell*, when plaintiffs seek "an injunction of a state's election law in the period close to an election," "the traditional test" for an injunction does not apply. *Id.* at 880. Instead, a plaintiff seeking to enjoin an election law shortly before the election bears a heightened burden of a four-part test, requiring plaintiff to establish:

> (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 409 (5th Cir. 2024) (quoting and applying Justice Kavanaugh's test from *Merrill*, 142 S. Ct. at 881).

In this case, we are well within "the period close to an election" (*Merrill*, 142 S. Ct. at 880): voting begins in just 44 days. The Supreme Court's recent applications of *Purcell* confirm the doctrine's reach. In *Abbott v. LULAC*, the Supreme Court applied *Purcell* to stay an injunction for the 2026 elections on December 4, 2025, when Election Day was eleven months away from the Supreme Court's order. *LULAC (2025)*, 146 S. Ct. at 419. The Court found the "District Court violated" the *Purcell* rule that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Id.* ("The District Court improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections.") The same reasoning calls for application of *Purcell* here (**<u>44 days</u>** until voting begins and **<u>87 days</u>** until the November 3, 2026 election day).

While eleven months may mark the outer reach of *Purcell*, numerous additional authorities confirm that this case falls well within the period in which *Purcell* concerns are directly implicated. *See*, *e.g., Merrill*, 142 S. Ct. at 879 (holding the district court should not have entered injunction nine weeks before the "elections beg[a]n (via absentee voting)"; the district court's injunction was improperly entered 120 days before election day, and the Supreme Court's stay was entered 106

days before election day); *Petteway v. Galveston Cnty.*, 87 F.4th 721 (5th Cir. 2023) (staying injunction entered two weeks before candidate qualifying deadline when primary election was approximately 144 days away).[5]

Certainly, *Purcell* applies here. Plaintiffs' contrary argument is unpersuasive. In their reply, Plaintiffs' asserted only that *Purcell* is exclusively an appellate court doctrine that only governs stays of injunctions pending appeal. [Doc. 50] at 4. But in *LULAC*, the Supreme Court explained that "[*t*]*he District Court violated* th[e] rule" from *Purcell* that "*lower federal courts* should ordinarily not alter the election rules on the eve of an election." *LULAC (2025)*, 146 S. Ct. at 420 (emphasis added). Plaintiffs' position—that *Purcell* constrains only appellate review—cannot be reconciled with *LULAC's* express directive to district courts.

On August 5, 2026, Plaintiffs submitted a letter to the Court identifying twenty authorities that they contend control the *Purcell* analysis. But none controls on the facts presented here. Moreover, those cases are readily distinguishable because they either: **(1)** predated *Purcell* or did not discuss *Purcell* at all, *see, e.g*, *Reynolds v. Sim*s, 377 U.S. 533, 585 (1964) (decided more than forty years before *Purcell*; nonetheless warning that courts should "avoid a disruption of the

[5] *See also Abbott v. LULAC*, --- S. Ct. ---, 224 L.Ed. 2d 525, 2026 WL 1127246 (2026) (reversing district court injunction entered 105 days before primary elections for reasons stated in *LULAC* (2025), *i.e. Purcell*); *Robinson v. Callais*, 601 U.S.____, 144 S. Ct. 1171 (2024) (staying injunction entered by the district court 174 days before the election when injunction was entered 189 days before the election); *Moore v. Harper*, -- U.S. --, 142 S. Ct. 1089 (2022) (mem.) (applying *Purcell* to stay injunction 92 days before primary election); *Raysor v. DeSantis*, -- U.S. --, 140 S. Ct. 2600 (2020) (mem.) (refusing to overturn the 11th Circuit's stay of an injunction under *Purcell*, where the Florida primary began August 18, 2020 and the district court enjoined the election on May 24, 2020 (86 days before primary)); *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022) (five months); *Andino v. Middleton*, -- U.S. --,141 S. Ct. 9 (2020) (mem.) (applying *Purcell* to stay injunction 46 days before a general election); *Singleton v. East Baton Rouge Parish School Board*, 621 F. Supp. 3d 618 (M.D. La. 2022) (denying preliminary injunction on *Purcell* grounds 83 days before election day, 69 days before early voting, and 38 days before the deadline for mailing absentee ballots to military and overseas voters); *Disability Rights Louisiana v. Landry*, 2024 WL 3566698, at *1 (M.D. La. July 29, 2024) (denying motion for preliminary injunction on *Purcell* grounds 99 days before the November 5, 2024 election).

election process which might result from requiring precipitate changes”);[6] **(2)** were later reversed or the injunctions stayed, *see, e.g.*, *Singleton v. Allen*, 2026 WL 1469518 (N.D. Ala. 2026) (stayed by *Allen v. Milligan*, 146 S. Ct. 1377 (2026)); and *LULAC v. Abbott*, 809 F. Supp. 3d 502, 596–601 (W.D. Tex. 2025), *reversed*, *Abbott v. LULAC*, 2026 WL 1127246 (Apr. 27, 2026); **(3)** involved materially different relief, such as narrow modifications to absentee-ballot procedures or voter registration, not an injunction materially changing election districts and setting new qualifying deadlines, *see, e.g.*, *New Hampshire Youth Movement v. Scanlan*, 2026 WL 1500857, at *45 (D.N.H. May 28, 2026) (permanent injunction after discovery regarding voter-registration laws); *Democratic Congressional Candidate Committee v. Kosinski*, 614 F. Supp. 3d 20, 60 (S.D.N.Y. 2022) (granting narrow relief for absentee ballot rejection procedures);[7] **(4)** enjoined executive action that interfered with election administration, *see*, *e.g.*, *California v. Trump,* 2026

[6] *See also Yang v. Kosinski*, 805 F. App'x 63 (2d Cir. 2020) (affirming a preliminary injunction concerning New York's cancellation of a presidential primary that did not involve late-stage judicial alteration of election administration nor relief requiring redistricting, candidate requalification, or a special election); *Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019) (never citing *Purcell* and addressing only the counting of a narrow category of absentee ballots rather than postponing an election, invalidating candidate qualifying, redrawing districts, or ordering a special election); *Louisiana v. Callais*, 146 S. Ct. 1131, 1162 (2026), judgment entered forthwith, 608 U.S. ----, 146 S. Ct. 1111 (May 4, 2026) (never discussing *Purcell*; directing prompt entry of judgment only after a final merits decision so district court would have time to consider appropriate remedy where no remedy had yet been ordered, Louisiana did not oppose prompt entry, and Governor had already postponed the affected congressional primaries); *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D. N.C. 2016) (never citing or discussing *Purcell*; ordering remedial redistricting only after full merits trial and final judgment, while giving North Carolina General Assembly the first opportunity to enact a remedial congressional map).

[7] *See also Harding v. Edwards*, 484 F. Supp. 3d 299 (M.D. La. 2020) (expanding absentee and early voting opportunities during the COVID-19 pandemic without altering district lines or postponing an election); *American Council of Blind Indiana v. Indiana Election Commission*, 2022 WL 702257, at *6 (S.D. Ind. Mar. 9, 2022) (requiring election officials to provide accessible absentee voting for blind voters); *Democracy North Carolina v. North Carolina State Board of Elections*, 476 F. Supp. 3d 158, 239 (M.D.N.C. 2020) (enjoining witness requirements for absentee ballots and extending the ballot receipt deadline during the COVID-19 pandemic); *One Wisconsin Institute, Inc. v. Thomsen*, 490 F. Supp. 3d 1338, 1344 (W.D. Wis. 2020) (requiring publication of guidance regarding absentee voting procedures rather than altering the structure or timing of an election); *Count US IN v. Morales*, 2026 WL 1009067, at *5–7 (S.D. Ind. Apr. 14, 2026) (enjoining enforcement of voter-registration restrictions without disturbing candidate qualifying, district maps, or election dates); *Carey v. Wisconsin Elections Commission*, 624 F. Supp. 3d 1020, 1046–47 (W.D. Wis. 2022) (granting relief concerning absentee-ballot procedures after finding sufficient time remained to implement the ordered changes before ballots were issued);

WL 2144084, at *1, *4 (1st Cir. July 29, 2026);[8] or **(5)** actually support Defendants' position because they recognize the concerns created by late-stage judicial changes to election rules, *see, e.g.*, *La Union del Pueblo Entero v. Abbott*, 754 F. Supp. 3d 720, 722–25 (W.D. Tex. 2024) (recognizing *Purcell* and staying portions of the injunction until after the election while permitting only limited relief to take immediate effect); *Malliotakis v. Williams*, 146 S. Ct. 809 (2026) (staying a state-court order requiring congressional redistricting before the election, thereby preventing judicial disruption of the impending election).[9]

Both the record and the case law support application of *Purcell*. Voting begins **44 days** from today. TR at 255:25-256:2 ("Q. And you would agree that absentee voting begins well before early October, wouldn't you? A. Yes. September 21"); *see also* TR at 756:16-17 ("September 21st is when absentee voting starts"); and D-34 (DeSoto County election website stating: "September 19: Absentee In-Person Voting Begins" and "In-Person Absentee Voting Hours starting September 19, 2026"). Election day itself is **87 days** away. D-17 at 13. *Purcell* applies and precludes the requested injunction.

---

[8] *See also Jones v. United States Postal Service*, 488 F. Supp. 3d 103, 108–14, 132–39 (S.D.N.Y. 2020) (preliminarily enjoining operational changes implemented by U.S. Postal Service that threatened timely delivery of election mail, while leaving state election procedures and election schedules intact); *LULAC v. Executive Office of the President*, 818 F. Supp. 3d 34, 82–83 (D.D.C. 2026) (enjoining Executive Order directing federal agencies to alter federal mail voter-registration process because it would permit federal interference with state election administration, rather than requiring federal court to redesign state's election procedures).

[9] *See also Robinson v. Ardoin*, 37 F.4th 208, 230 (5th Cir. 2022) (denying a stay where election was five months away and Louisiana demonstrated at trial it had administrative capacity to draw new map before election); *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016) (following final merits determination, not a P.I. proceeding, directing North Carolina to enact remedial congressional plan while preserving Legislature's primary role in redistricting).

## II. The evidence shows Plaintiffs' relief is not feasible before the election without significant cost, confusion, and hardship.

The evidence shows that Plaintiffs' requested relief would cause "significant cost, confusion, and hardship" in multiple respects. *La Union Del Pueblo Entero*, 119 F.4th at 409 (quoting *Merrill*, 142 S. Ct. at 881). An injunction should not issue.

***First***, enjoining the challenged laws at this late date would create the very risk of "chaos for candidates, campaign organizations, independent groups, [and] … others" identified in *Merrill*, 142 S. Ct. at 880. At the hearing, Malenda Meacham offered unrebutted testimony concerning the cost, confusion, and hardship she would suffer if an injunction issues this soon before the election. TR at 791-884. She testified to the extensive campaign efforts that she, her opponent, and circuit court candidates have made since January 2026 and before. She confirmed her decision to run for the subdistrict seat was a difficult one, requiring much counseling with her family, friends, and employees of her successful law practice – a practice she had to scale down by about 75 percent to run for office. TR at 796-97 (testifying she has only taken on four new cases since she began her race in January) She also testified to campaign efforts she made before she officially qualified and began campaigning on January 2, 2026. *See* Ex. 8 at 2.

Meacham testified she and the other subdistrict candidates have been "campaigning, actively campaigning since January." TR at 822:3-4. She has spent nearly $17,000 of her own money since January 2, 2026. TR at 809:13-22; Ex. 19 at 9. She has devoted substantial time to her campaign, including weekly campaign efforts, and she thinks about the election "all of the time," "every day." TR at 806-07. She testified the amount she has spent does not include the "opportunity costs" for all the time she spent campaigning and planning the election that she could have spent in her formerly "thriving" law and mediation practice. TR at 922. She testified to all the events she has attended (only some of which are shown on her Facebook page), *see* D-8; the

campaign-related conversations she has had outside of events; and the time spent seeking endorsements. She testified her efforts have been supplemented by more time and money spent by the three members of her campaign committee and other supporters. TR at 805.

Meacham also testified specifically to her focused efforts exclusively within the subdistrict. TR at 843-845. She testified to the extensive efforts she has taken for months to inform voters about the subdistrict and who could vote for her. *See, e.g.*, TR at 822. She informs her social media followers repeatedly that she is running for subdistrict 17-1 and explains where that is. D-8 at 2; P-19 at 7. She obtained a map of the subdistrict from Judith Wammack on January 6, 2026, so that she could inform voters about the subdistrict. TR at 811:9-22; 843:4-12. She posted the map on social media for public and voter education. D-8; D-9. She brings the maps to her campaign events to help educate voters. D-8 at 5 (photographs of maps on table at campaign event). She has the map on her phone and has used it regularly to explain to voters in person (outside of campaign events) where the subdistrict is. *See, e.g.*, TR at 824:2 (when asked how many conversations she has had with voters concerning the subdistrict, Meacham testified "I mean, I couldn't count. It's what I'm doing all of the time.").

Meacham shared with the Court the hardship she would suffer were this Court to enter an injunction. *See* 833:2-835:4. She testified "if the qualifying deadline were to be reopened, [she's] essentially running in a whole different election." TR at 833:4. She has been focused on the subdistrict so, "all of [her] efforts thus far would be severely minimized." TR at 833:14. She would have to "revamp [her] whole entire campaign strategy." TR at 833:15. Most of the campaign materials she has created (including the materials naming her opponent, naming the subdistrict, or displaying the map) would become incorrect and unusable. TR at 833:18-23. A countywide election would cost more money and time, and adding another candidate would likely result in a runoff. TR at 833:2-7. She further testified that a runoff would be cost-prohibitive. TR 833:13-17

("I don't even known how that's possible. We have a hard enough time right now"). She has spent time obtaining endorsements, all of which could be in jeopardy if an injunction called for a countywide race. TR at 833:20. Indeed, Meacham testified that "[i]t seems insurmountable to have somebody else jump in the race" at this point. TR at 834:4.

Meacham testified that the hardship in the event of an injunction would be so severe that she hired an attorney to intervene in this litigation. TR at 834:12-15. She testified she "basically shut down a successful law practice, a very successful law practice, committed to this because [she] care[s] about what [she's] doing." TR at 834:15-20. Simply put, she testified all or most of her campaign efforts thus far "would be for naught" if an injunction issues. TR at 834:3.

In response to this compelling testimony on candidate/campaign expenditures of time, effort, and money, Plaintiffs did not even address this significant factor in closing arguments. *See* TR at 888-902.

***Second***, granting Plaintiffs' requested injunction would cause "voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. The evidence demonstrates that if an injunction issues, "voters are going to be confused." TR at 833:20-21 (emphasis added). Multiple groups have distributed information to voters about the subdistrict, all of which will be rendered inaccurate if there is an injunction. The Secretary of State has provided the public and county clerks with a list of candidates who qualified for the various races. P-27. DeSoto County has published on its website that "[s]ome judicial positions are elected countywide, while others are elected by specific precincts (subdistricts)." D-7. The page lists each of the candidates' names and explains that they are running for Chancery "Place Three-Subdistrict 17-1" and Circuit "Place Four – Subdistrict 21-1." *Id.* That website contrasted the judge candidates who are running "countywide" from the subdistrict judicial candidates, stating "[t]his [subdistrict] race appears only on ballots in select precincts." *Id.*

Multiple DeSoto County employees testified they have been informing voters about the subdistrict and who could vote for the subdistrict candidates. Judith Wammack testified she first made a map of the subdistrict for Malenda Meacham on January 5-6, 2026. TR at 290. Her office made maps for five other people, including candidate John Hughes. TR at 318-19. She confirmed the maps on Meacham and Hughes' public Facebook pages were created by her office. *See* D-8; D-12. Brandi Johnson, deputy circuit clerk, provided to Malenda Meacham and others the voter lists of constituents in the subdistrict by at least December 2025. TR at 767. The candidates have been using the voter lists for "canvassing" in the subdistrict. TR at 812:18.

It is undisputed that the subdistrict candidates have been informing voters about the subdistrict (and who would be eligible to vote in it) since at least January 2, 2026. *See* D-8 at 2 (Meachem's opening campaign post); *see also* D-8 at 6 and D-9 (Meachem's posting of subdistrict map on her Facebook and Instagram page as part of her public voter-education campaign); D-8 at 5 (demonstrating Meachem brings the subdistrict maps to events to inform voters). Candidate John Hughes likewise published the subdistrict map he received from DeSoto County. D-12 at 13.

This evidence supports Meacham's testimony that "voters are going to be confused" if the election framework changes now. TR at 833:20-21. Plaintiffs point only to anecdotal opinions from County officials that voters do not pay attention to who is running in elections. TR at 108:23-109:14; 198:17-20. But those statements are difficult to reconcile with the documented voter-education efforts in this record. (Frankly, those statements are also in tension with Plaintiffs' own testimony that they all knew who was running in the upcoming election. TR at 487:18-22; 501:16-23; 231:2-5) At any rate, it is undisputed that candidates, the County, and the Secretary of State have spent months working to educate voters on election and candidate information; changing the election framework at this stage would, at minimum, render previously distributed information

inaccurate and create a substantial risk of voter confusion. The record simply does not support Plaintiffs' contention that the requested relief could be implemented without confusing voters.

***Third***, enjoining the challenged laws would unduly burden election officials, risking widespread disruption and unanticipated consequences for candidates, voters, and others. *Merrill*, 142 S. Ct. at 881.[10] Plaintiffs sought to put on evidence at the hearing that the administrative burden on DeSoto County would be limited. TR at 741-750. But even the DeSoto County officials acknowledged in testimony that there would be additional time and effort in the event of an injunction. TR at 748:19-749:9. But of course, the effects extend beyond DeSoto County election officials. The Secretary of State has already performed work preparing for the election. That office is required to prepare all materials for the SBEC meeting, scheduled for August 25, 2026. That meeting must take place in advance of September 4, 2026, when the Mississippi Code requires the SBEC to approve all candidates (**27 days** from today). An injunction would require the Secretary of State's office to perform additional work for Desoto County, while also coordinating all the other elections in the State. Furthermore, any ruling by this Court that causes the Secretary of State to miss the September 4, 2026, statutory deadline to release the sample ballot statewide will adversely impact circuit clerks' offices in *all 82 counties*. *See, e.g.*, TR at 628.

Plaintiffs' only other argument on this factor does not materially change the analysis. Plaintiffs say "we have a special election coming up anyway," referring to the appointment of unopposed candidate Celeste Wilson to the Mississippi Supreme Court. TR at 901:11-12. The

---

[10] As previously briefed by Defendants, other public interests and equities beyond those discussed in *Purcell* also preclude an injunction here. Specifically, to the extent Plaintiffs request that the Court enjoin the laws in their entirety such that there is no election for the subdistrict judges, then DeSoto County's citizens will be irreparably harmed by the loss of access to justice. But Plaintiffs appear to have abandoned that specific request for relief and instead request that the election be open to a countywide vote and that the Court order a new qualifying period. *See* [Doc. 43] at 14. To the extent Plaintiffs request the election is enjoined altogether, the public interest in providing more judges to DeSoto County weighs so strongly against an injunction that it should be denied on that basis alone.

Governor is *required by statute* to reopen qualifying for now-Justice Wilson's former circuit court post, with the general election to proceed as scheduled on November 3, 2026. *See* Miss. Code Ann. § 23-15-977(4). That is materially different from this Court declaring Mississippi statutes unconstitutional, enjoining the Legislature's judicial redistricting scheme, ordering that the election proceed countywide, and ordering a new qualifying deadline so that new candidates can run against the four candidates that have been campaigning for a subdistrict for the past seven-plus months. Again, Plaintiffs' argument fails to account for the substantial cost, confusion, and hardship that such an injunction would impose on the candidates, their supporters, and voters.

The ballot must be ready in **27 days**. Voting begins in **42 days** for at least some voters and **44 days** for others. Election day is in **87 days**. These are statutory deadlines,[11] and they have been published widely by the Secretary of State and DeSoto County. *See* D-17 (Secretary of State election calendar); D-34 (DeSoto County website). Given the undisputed active campaigning and voter education that has occurred over the past seven-plus months, and other preparations for the election, no injunction can issue without significant cost, confusion, or hardship. The Court should deny the requested relief.

---

[11] Plaintiffs argue the statutory deadline by which the Secretary of State must release the statewide sample ballot, Miss. Code Ann. § 25-15-367, contains an exception. TR at 591:14–592:9. But that limited exception does not apply to the nonpartisan judicial elections here. As testified by Ms. Henderson-Courtney, it applies only where "there is a primary election runoff that causes [a] delay." TR at 592 (emphasis added). Here, there is no primary. Plaintiffs also argue the statutory deadline for transmitting absentee ballots to UOCAVA voters provides flexibility when the ballots are not printed. But as Ms. Henderson-Courtney testified, UOCAVA ballots must be sent 45 days before the election, with compliance monitored by the U.S. Department of Justice. TR at 600:16–602:2. Even Plaintiffs' witness Brandi Johnson testified that she must transmit UOCAVA ballots by "noon on September 19th"—45 days before election day. TR 755:6-11. These interpretations are supported by federal law. *See* 52 U.S.C. § 20302(a)(8) (requiring states to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election."). Relatedly, Plaintiffs argue the statutory deadline for absentee voting is lenient where the ballots are not printed timely. TR at 602:12-16. But Plaintiffs' theory is inconsistent with Ms. Johnson's testimony that absentee voting begins sharply at 8:00 a.m. on September 21st. TR at 757:13-23.

## III. Plaintiffs have unduly delayed bringing the complaint to court.

As to the third *Purcell* factor, the record establishes that Plaintiffs "unduly delayed bringing the complaint to court"—so an injunction should not issue. *Merrill*, 142 S. Ct. at 881; *see also Benisek v. Lamone*, 585 U.S. 155, 159-61 (2018) (denying preliminary relief where plaintiffs waited after adoption of a redistricting plan to seek an injunction because "a party requesting a preliminary injunction must generally show reasonable diligence"). This factor is independent of the "cost, confusion, and hardship" factor discussed above. Undue delay is *standing alone* sufficient to support denial of preliminary relief. [12] (It makes for an even more straightforward analysis when, as here, the other *Purcell* factors also collectively demand the same result.)

The record warrants a finding of undue delay. The relevant dates are undisputed. The challenged laws were signed into law on April 23, 2025 (**fifteen months ago**). D-3; D-4. The testimony is undisputed, and Plaintiffs themselves admit, that they knew about the challenged laws and began expressing their concerns about them in the summer of 2025, **a year ago**. TR at 400:10-15; 401:9-18.

Plaintiffs offer several explanations for the timing of their suit, but the undisputed chronology remains: they did not pursue litigation until July 2, 2026, fifteen months after the challenged laws were enacted and just four months before the election. Plaintiffs argue they are "non-lawyers" and contend that this circumstance should excuse the timing of their suit. But the evidence is undisputed that they were concerned about and believed the challenged laws were

[12] *McClure v. Jefferson Cnty. Comm'n*, No. 25-13253, 2025 WL 2977740, at *3 (11th Cir. Oct. 16, 2025) ("The plaintiffs' delay, on its own, is sufficient to warrant a stay" where plaintiffs waited more than 17 months to bring these suits after adoption of the districting plan); *Grace, Inc. v. City of Miami*, No. 23-12472, 2023 WL 5286232, at *4 (11th Cir. Aug. 4, 2023) (granting stay where "the plaintiffs waited eleven months to seek an injunction."); *Felder v. City of Dallas*, No. 3:23-CV-437-N-BN, 2023 WL 3689619, at *4 (N.D. Tex. Apr. 20, 2023), report and recommendation adopted, No. 3:23-CV-437-N-BN, 2023 WL 3689991 (N.D. Tex. May 26, 2023) (finding undue delay where challenged map was finalized on June 27, 2022 but plaintiff did not file suit "until February 24, 2023, a few days shy of eight months later – and one week after February 17, 2023, the statutory filing deadline for candidates for the May 6 election.").

unconstitutional as early as July 2025. TR at 400:10-15; 401:9-18. Plaintiffs claim their legislative representatives could not speak out at the State Capitol against the challenged laws for fear of being "reprimanded." TR at 127:12-17. But the DeSoto caucus, including Representative Eubanks, all voted for the challenged laws, and the record reflects no legislative dissent from the DeSoto caucus. D-23, D-25, and D-31.

There were several events that should have motivated Plaintiffs to seek judicial relief. For instance, when related legislation was before state officials early in the 2026 session, the DeSoto caucus did not take any action. D-5, D-6. Still, Plaintiffs didn't file suit. Then, on April 23, 2026, the Governor issued a proclamation calling for a special session in light of *Callais* "for the sole and exclusive purpose" of considering Supreme Court districts, but did not call a session for the DeSoto County judicial districts. TR at 223-24; D-33. Still, Plaintiffs didn't file suit. Then, on May 5, 2026, Plaintiff Foster and other supervisors sent a letter to the Governor demanding a separate special session to consider the DeSoto County judicial districts. TR at 352:21-353:7. Plaintiff Foster noted in the letter that time was of the essence: "[i]t is imperative for all parties involved that this issue be addressed **immediately**." D-28. There was no special session called for DeSoto County judicial districts in response to this letter. Still, Plaintiffs didn't file suit for almost two more months. TR at 228:17-23.

Neither does *Callais* account for the timing of Plaintiffs' suit. The Supreme Court's decision in *Callais* "does not change the fact that plaintiffs could have sought a preliminary injunction much earlier." *Benisek*, 585 U.S. at 160. Plaintiffs' Verified Complaint asserts claims under the 14th and 15th Amendments of the United States Constitution, Section 2 of the Voting Rights Act, and Sections 87 and 90 of the Mississippi Constitution of 1890. Only one of Plaintiffs' three claims implicates the new *Callais* framework. Plaintiffs' claim for "Vote Denial Regardless of Race" is based on the one-person-one-vote principle, which has existed for more than sixty

years. *See Gray v. Sanders*, 372 U.S. 368, 381 (1963). Plaintiffs' claim under Sections 87 and 90 of the Mississippi Constitution (now apparently confessed) is based on a 135-year-old textual argument. If the challenged laws were indeed unconstitutional, as Plaintiffs argue, they were so on April 23, 2025, when they were passed, so Plaintiffs could have filed their lawsuit then or at least early enough to not disrupt an already-in-progress election.

Even assuming *Callais* was necessary to Plaintiffs' claims (it was not), Plaintiffs still could have filed suit several weeks earlier. *See Callais*, 146 S. Ct. at 1311 (decided April 29, 2026). As early as May 5, 2026, Plaintiff Robert Foster admitted in his letter to the Governor that *Callais* rendered the challenged subdistrict lines unconstitutional. D-28. He asked for "immediate" relief from the Governor, but when that relief wasn't granted, he did not take immediate action in court. Plaintiffs' delay, alone or in combination with the other factors, requires denial of the requested injunction.

## IV. <u>Plaintiffs' likelihood of success on the merits is not "entirely clearcut," as required by *Purcell*. In any event, the merits factor is not dispositive.</u>

Plaintiffs' success on their claims is not "entirely clearcut," as *Purcell* requires to grant injunctive relief at this stage. *La Union Del Pueblo Entero*, 119 F.4th at 409 (quoting *Merrill*, 142 S. Ct. at 881).[13] Plaintiffs assert three claims: they cannot prevail on the first as a matter of law;

[13] As Defendants have briefed, the merits are not the most important factor in analyzing whether to enjoin an election law on the eve of the election. "As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek*, 585 U.S. at 158. District courts regularly follow the Supreme Court's mandate and allow elections to move forward as planned even when the courts have "grave concern" that election laws are unconstitutional. *See, e.g., McLemore v. Hosemann*, 414 F. Supp. 3d 876, 887 (S.D. Miss. 2019); *see also Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968) (affirming denial of equitable relief and allowing election to continue despite unconstitutional state election law); *Watkins v. Mabus*, 771 F. Supp. 789, 807 (S.D. Miss. 1991), *aff'd in part, vacated in part Watkins v. Mabus*, 502 U.S. 954, 112 S. Ct. 412 (1991) (denying injunctive relief to enjoin district plans that were "doubtless unconstitutionally malapportioned"); *Texas Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, (5th Cir. 2020) (staying district court injunction to minimize voter confusion while merits arguments continued); *Veasey v. Perry*, 769 F.3d 890, 895-96 (5th Cir. 2014) (staying lower court's injunction of challenged law because the harm to the State outweighed potential harm to plaintiffs); *Boddie v. City of Cleveland*, 2001 WL 1523854, at *2 (N.D. Miss. April 24,

the second is not ripe for adjudication on a limited record; and they have abandoned the third. Plaintiffs cannot meet the heightened *Purcell* test on this factor.

Plaintiffs cannot succeed on their Count I, one-person-one-vote claim under the Equal Protection Clause, because that principle does not apply to judicial elections as a matter of law. Count I is not viable because the Supreme Court has "held the one-person, one-vote rule inapplicable to judicial elections." *Chisom v. Roemer*, 501 U.S. 380, 402 (1991) (citing *Wells v. Edwards*, 409 U.S. 1973), *aff'g* 347 F. Supp. 453, 454 (M.D. La. 1972)). This rule is well-established.[14] Plaintiffs cite no contrary authority, *see* Plaintiffs Reply [Doc. 50]. That claim is foreclosed.

Plaintiffs' Count II race-based claim cannot satisfy *Purcell's* clear-cut merits requirement on this incomplete record. As the Court has ruled, race-based claims are "fact-intensive," requiring discovery and a fully-developed record. [Doc. 57] at 10. "Plaintiffs' discriminatory intent claims, which require a fact intensive examination of the record, are particularly unsuited for resolution" without a full record; "[t]his is because the legislature's motivation is itself a factual question." *Id.* (quoting *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 983 (N.D. Fla. 2021) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999))). Even apart from discovery, the evidentiary record is incomplete. Plaintiffs' legislative-history evidence consisted solely of House debate from one of the several days on which the bills were considered. *Compare* P-5 *with* D-3, D-4. The February 6, 2025 House debate contains multiple levels of hearsay and also references non-racial reasons

2001) ("[E]ven where plaintiffs have demonstrated liability on the merits, or a strong likelihood of prevailing, courts typically refuse to enjoin elections at the last minute.").

[14] *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208 (5th Cir. 1980) ("While excellent arguments have been made as to why the 'one man one vote' principle should apply to Judges . . . we are bound with respect to this specific issue by the Supreme Court's affirmance in *Wells*"); *Panior v. Iberville Par. Sch. Bd.*, 498 F.2d 1232, 1235 n.5 (5th Cir. 1974) ("a state judicial elections need not be conducted in a one-man one-vote manner"); *Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 859, n.3 (5th Cir. 2004) ("As the district court recognized, the one-person, one-vote requirement . . . does not apply to judicial districts like Justice Precinct").

for the challenged laws, including the statutory criteria. *See* P-5. Further that debate did not involve the final version of the bill. Plaintiffs offered no evidence regarding Senate Bill 2768. Moreover, the law requires that courts "honor the presumption of legislative good faith." *LULAC (2025)*, 146 S. Ct. at 419. Granting preliminary relief on this record would risk doing precisely what *LULAC* cautions against: "fail[ing] to honor the presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against the legislature." *Id.*

Finally, as to Count III, Plaintiffs have abandoned their Mississippi Constitution claim after Defendants argued the Supreme Court's decision in *Pennhurst* bars such a claim in federal court, and in any case, the claim is not viable under Mississippi law. *See* [Doc. 43] at 19-20 (quoting *Williams ex rel J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984))). Plaintiffs made no reference to their Mississippi Constitution claim in their reply brief, [Doc. 50] or in arguments to the Court at the hearing, *see* TR at 888-902 (Plaintiffs' closing statement) and therefore such claim is apparently confessed.

**V. <u>The harm an injunction would cause Defendants outweighs any harm the individual-voter Plaintiffs may experience without an injunction.</u>**

Plaintiffs' record does not establish irreparable harm in the absence of an injunction. But even if it had, the balance of harms weighs against preliminary relief.

"Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). On this record, there is no evidence that Plaintiffs will suffer irreparable harm by voting for five countywide judge seats. Plaintiffs argued that they are irreparably harmed because the subdistrict voters get to vote for additional judges. But this alleged irreparable harm is dependent on the one-person-one-vote theory, which (again) does not apply to judicial elections. *See Chisom*, 501 U.S. at 402 (citing *Wells*, 409 U.S. 1973). Plaintiffs also claim they are harmed because it is "unfair"

that they are not given an opportunity to vote for a judge that will preside over cases for the whole county, but that is no different than the current state of affairs in DeSoto County. Specifically, DeSoto County is part of a six-county chancery court district where DeSoto County voters elect only one of the three judges in the district, all of whom have full judicial authority over all six counties in the district. TR at 792:24. Based on this evidence, any such irreparable harm remains speculative. Further, to the extent there is any issue with the challenged laws and the subdistrict, the Legislature can address it in the upcoming legislative session—and should be afforded the first opportunity to do so. *Chisom*, 853 F.2d at 1189.

Even if the Court assumes irreparable harm for Plaintiffs, it must be balanced with the harm to Defendants. The State and its citizens will necessarily suffer irreparable harm: when any statute is enjoined, election law or otherwise, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). Here, when election laws may be enjoined, the State's interest is especially weighty because "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4. Late changes to election laws risk undermining public confidence in elections, and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Id*. "Court orders affecting elections . . . result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, the risk will only increase."[15] *Id.*

[15] And multiple witnesses testified about DeSoto County's need for the additional judges provided in the challenged laws. TR 48:7-11; 121:12-15, 23-24; 793:12-19. Enjoining the election would prevent those judges from taking office and managing DeSoto County's caseload.

To the extent the individual voter Plaintiffs put on any evidence that they will suffer irreparable harm absent an injunction, the balance of harms nevertheless favors the State and the public.

## VI. Plaintiffs seek extraordinary relief that is not warranted.

Plaintiffs clarified in their opening statement and closing argument the particular relief they seek: They do not request that the Court enjoin the election altogether; they instead urge the Court to preserve the election while requesting broad relief that fundamentally changes the challenged laws, redraws district lines, and requires the Court to call a special election and set a qualifying deadline. TR at 11; 947-48. The Court should decline Plaintiffs' request.

In addition to the incredible practical obstacles, to fulfill Plaintiffs' request would require the Court to improperly make policy choices. *See, e.g., McLemore*, 414 F. Supp. 3d at 887 (noting courts are "ill-equipped" to make policy decisions). Granting this request would be an "extraordinary departure from the traditional course of relations between the States and the Federal Government," causing the people of DeSoto County to "endure an entire election cycle under a 'federal intrusion into sensitive areas of state and local policymaking.'" *Petteway*, 87 F.4th at 725. The Legislature should be afforded the first opportunity to address these policy decisions. *See, e.g., Chisom,* 853 F.2d at 1189 (stating rule that the Legislature should be extended opportunity to address before federal intervention).

Plaintiffs' request also finds no support in the authorities they cite. While an injunction concerning an election law is an extraordinary remedy alone, ordering a special election or similar remedies is even more extraordinary. *See, e.g.*, *Miss. State Conf. of Nat'l Assoc. for Advancement of Colored People v. State Bd. of Election Commissioners*, 741 F. Supp. 3d 509, 514 (S.D. Miss. 2024) (three-judge panel refusing on July 18, 2024, to order special elections for November 5, 2024). Likewise, Defendants can find no case where a federal court, on a preliminary-injunction

record without discovery or a fully developed record, ordered relief comparable to what Plaintiffs request here, and certainly not this close to an election. The authorities cited here in Defendants' brief certainly give no basis for the broad relief Plaintiffs request—44 days before voting begins—on the present record. The Court should deny Plaintiffs' requested relief.

## CONCLUSION

There are **27 days** before the ballot must be final, **42 days** until UOCAVA voting begins, **44 days** until in-person absentee voting begins, and **87 days** until the election ends on Tuesday, November 3, 2026. The challenged laws were passed fifteen months ago, and candidates have been actively campaigning for at least seven months. An injunction now would risk voter confusion, destabilize completed election preparations, unduly burden State and County election officials, and create "chaos for candidates, campaign organizations, [and] . . . others." *Merrill*, 142 S. Ct. at 880. Taken together, the *Purcell* factors demand the denial of preliminary relief.

Date: August 8, 2026.

Respectfully submitted,

**THE STATE OF MISSISSIPPI, THE STATE BOARD OF ELECTION COMMISSIONERS, TATE REEVES, LYNN FITCH, and MICHAEL WATSON**

By: *s/ Samuel C. Kelly*
One of Their Attorneys

OF COUNSEL:

Samuel C. Kelly (MSB #7496)
skelly@brunini.com
William Trey Jones, III (MSB #99185)
tjones@brunini.com
L. Kyle Williams (MSB #105182)
kwilliams@brunini.com
Jacob A. Bradley (MSB #105541)
jbradley@brunini.com
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
190 East Capitol Street, Suite 100 (39201)
Post Office Box 119
Jackson, MS 39205-0119
Telephone: (601) 948-3101
Facsimile: (601) 960-6902

Stephen F. Schelver (MSB #101889)
State of Mississippi
Office of the Attorney General
Civil Litigation Division
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-3522
Fax: (601) 359-2003
stephen.schelver@ago.ms.gov

*Counsel for the State of Mississippi, The State Board of Election Commissioners, Tate Reeves, Lynn Fitch, and Michael Watson*

**CERTIFICATE OF SERVICE**

I, Samuel C. Kelly, hereby certify that on this day, August 8, 2026, caused the foregoing pleading to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all counsel of record and registered participants.

*s/ Samuel C. Kelly*