IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

ROBERT FOSTER, KATIE LIGON,
KIRBY CARTER, and JOHN T. WILLIAMS                                    PLAINTIFFS

v.                                                    CIVIL ACTION NO. 3:26-CV-181-SA-JMV

THE STATE OF MISSISSIPPI, et al.                                    DEFENDANTS

ORDER AND MEMORANDUM OPINION

On July 2, 2026, Robert Foster, Katie Ligon, Kirby Carter, and John T. Williams filed their Verified Complaint [1] against the State of Mississippi, the State Board of Election Commissioners, Governor Tate Reeves, Attorney General Lynn Fitch, and Secretary of State Michael Watson ("the State Defendants"). The Complaint [1] challenges the lawfulness of certain portions of House Bill 1544 and Senate Bill 2768, which the Mississippi Legislature passed and the Governor signed into law in April 2025 and which take effect January 1, 2027. Along with their Complaint [1], the Plaintiffs filed a Motion for Preliminary Injunction [3] seeking injunctive relief prior to the upcoming November 2026 election. By Order and Memorandum Opinion [57] entered on July 29, 2026, the Court permitted Malenda Harris Meacham, DeSoto County NAACP, and Delta Sigma Theta Sorority, Inc. to intervene as Defendants.

On July 31, 2026, the Court convened a hearing on the Plaintiffs' Motion for Preliminary Injunction [3]. The hearing spanned four days, during which the Court heard testimony from eight witnesses and received extensive evidence. Having considered the evidence, arguments of counsel, the applicable authorities, and the record as a whole, the Court is prepared to rule.

*Brief Factual and Procedural Overview*

Though the parties sharply contest multiple aspects of this election case, many of the relevant underlying facts are undisputed.

Article 6, § 152 of the Mississippi Constitution requires that the Mississippi Legislature redistrict the State's circuit and chancery court districts within five years of each decennial census. *See* MISS. CONST. Art. 6, § 152. Consistent with this requirement, in April 2025, the Legislature passed H.B. 1544, which reconfigured the State's circuit court districts, and S.B. 2768, which concerned the chancery court districts.

Section 38 of H.B. 1544, which is codified at Mississippi Code Section 9-7-63 and became effective April 23, 2025, designated DeSoto County as its own circuit court district. *See* MISS. CODE ANN. § 9-7-63 ("The Twenty-first Circuit Court District shall be composed of DeSoto County."). Section 39 of H.B. 1544, which is codified at Code Section 9-7-64, provided for three circuit judges for the district to be elected from the entire district on an at-large basis. H.B. 1544 § 39, 2025 Reg. Sess., 125th Sess. (Miss. 2025); MISS. CODE ANN. § 9-7-64 (effective until December 31, 2026). But that Section also includes language modifying the statute effective January 1, 2027. *Id*. Effective that date, the statute will provide as follows:

> (1) There shall be four (4) circuit judges for the Twenty-first Circuit Court District.
>
> (2) For the purposes of appointment and election, the four (4) judgeships shall be separate and distinct and denominated as "Place One", "Place Two", "Place Three" and Place Four". The judges to fill Place One, Place Two and Place Three shall be elected from within the district. Place Four shall be a subdistrict denominated as 21-1. The judge to fill Place Four shall be elected from the following precincts in DeSoto County: Horn Lake Central, Horn Lake East, Horn Lake High School, Horn Lake Intermediate School, Horn Lake North, Horn Lake West, Northwest Community College, Southhaven South and Southhaven West.

*Id*.; MISS. CODE ANN. § 9-7-64 (effective Jan. 1, 2027).

Thus, applying this language, three of the circuit judges are to be elected from the entire district (or, in this case, the entire county), and one of the judges is to be elected from a subdistrict

consisting of nine specific precincts. The judge elected from the subdistrict will have jurisdiction over the entire district.

S.B. 2768 concerns chancery court districts. Pursuant to Section 23 thereunder, effective January 1, 2027, DeSoto County will constitute its own chancery court district with the specific statutory language providing:

(1) The Seventeenth Chancery Court District is composed of DeSoto County.

(2) There shall be three (3) chancellors for the Seventeenth Chancery Court District. The chancellorships shall be separate and distinct and denominated as "Place One," "Place Two" and "Place Three." The chancellor to fill Place One and Place Two shall be elected from all of the precincts within the district. Place Three shall be a subdistrict denominated as 17-1 for purposes of appointment and election. The chancellor to fill Place Three shall be elected from the following precincts in DeSoto County: Horn Lake Central, Horn Lake East, Horn Lake High School, Horn Lake Intermediate School, Horn Lake North, Horn Lake West, Northwest Community College, Southhaven South and Southhaven West.

S.B. 2768 § 27, 2025 Reg. Sess., 125th Sess. (Miss. 2025); MISS. CODE ANN. § 9-5-51 (effective Jan. 1, 2027).

Thus, elections for chancellors in this district are structured in the same manner as circuit judgeships. Two chancellors are to be elected on a districtwide (or countywide) basis, and one chancellor is to be elected from the same subdistrict as applicable to circuit judgeship Place Four. Like the circuit judge elected from the subdistrict, the chancellor elected from this district will have jurisdiction over the entire district.

For purposes of this litigation, the racial makeup of DeSoto County as a whole and the subdistrict in particular is important. According to the Complaint [1], "the Majority-Minority

Subdistrict's voting-age population is 50.52% any part black and 40.83% white, whereas DeSoto County's entire voting-age population is 24.85% any part black and 67.13% white." [1] at p. 14.

In light of the fact that these legislative amendments to the judicial seats in DeSoto County become effective on January 1, 2027, elections for those seats are scheduled for the upcoming November 3, 2026 election. The qualifying window for the 21-1 circuit court subdistrict and 17-1 chancery court subdistrict was January 2, 2026 through February 2, 2026. Two candidates qualified for each position with Lucius Edwards and John Hughes qualifying for the circuit court position and Gwendolyn Baptist and Malenda Harris Meacham qualifying for the chancery court position.

On July 2, 2026, the Plaintiffs initiated this lawsuit. The description provided in the Complaint [1] for three of the four Plaintiffs—Robert Foster, Katie Ligon, and John T. Williams— is the same, specifically alleging that they reside in DeSoto County but outside of the subdistrict and that they "plan[] to vote in the November 2026 general election and would vote for the Place Four circuit judge and the Place Three chancellor created by H.B. 1544 and S.B. 2768 if allowed." [1] at p. 3. The other Plaintiff is Kirby Carter, and the Complaint [1] provides a different description as to her interest in the litigation:

> Plaintiff Kirby Carter resides in DeSoto County, Mississippi. She is a U.S. citizen and a lawfully registered voter who resides in the Twenty-first Circuit Court District established by H.B. 1544 and in the Seventeenth Chancery Court District established by S.B. 2768. Kirby resides within the Majority-Minority Subdistrict established by H.B. 1544 and S.B. 2768 in the Twenty-first Circuit Court District and the Seventeenth Chancery Court District. Carter plans to vote in the November 2026 general election, and as a White voter within the Majority-Minority Subdistrict, her vote is unconstitutionally diluted based on race.

[1] at p. 4.

The Complaint [1] contains three claims, which are styled as follows:

Count I: Vote Denial Regardless of Race (Violation of the Fourteenth Amendment);

Count II: Vote Denial Based on Race (Violation of the Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the Voting Rights Act);

Count III: Violation of the Mississippi Constitution.

[1] at p. 11, 13, 15.

Through their Motion for Preliminary Injunction [3], the Plaintiffs request that the Court enjoin the State Defendants from utilizing the subdistrict in carrying out the upcoming November 3, 2026 elections. They request that the Court strike down the subdistrict, direct that the elections be carried out on a districtwide basis, reopen the candidate qualifying deadline, and allow the election to proceed on November 3, 2026. Alternatively, they request that the Court strike down the subdistrict, enjoin the November 2026 election as to the two judgeship positions that will be elected from the subdistrict, and instead order a special election to be held at a later date. The Defendants oppose the Plaintiffs' request in every respect.

*Analysis and Discussion*

At the outset, the Court finds it appropriate to resolve a dispute between the parties as to the way in which the Court should analytically apply the well-known *Purcell* principle.

The principle itself stems from the Supreme Court's 2006 decision in *Purcell v. Gonzalez*, 549 U.S. 1, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006) (per curiam). Under the *Purcell* principle, "[t]he Supreme Court has 'repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'" *Texas Alliance for Retired Americans v. Hughs*, 976 F.3d 564, 566 (5th Cir. 2020) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424, 140 S. Ct. 1205, 206 L. Ed. 2d 452 (2020)). In his concurrence in *Merrill v. Milligan*, Justice Kavanaugh (joined by Justice Alito) articulated the rationale underlying this general rule:

5

> That principle—known as the *Purcell* principle—reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring).

Notably, "[e]ven seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." *La Union Del Pueblo v. Abbott*, 119 F.4th 404, 408 (5th Cir. 2024) (quoting *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 31, 208 L. Ed. 2d 247 (2020) (Kavanaugh, J., concurring)).

The Defendants raise the *Purcell* principle as a bar to the Plaintiffs' request for injunctive relief. In the Defendants' view, it is simply too close to the November 2026 election for this Court to modify the governing rules in any way whatsoever. This Court's intrusion into a state election at this late stage would, they say, violate the federalism concerns underlying the *Purcell* principle. On the other hand, the Plaintiffs contend that *Purcell* is not a wholesale bar. They request that the Court apply the traditional four factor test applicable to a request for preliminary injunction and subsequently consider *Purcell* in some form or fashion thereafter.

Having reviewed extensive case law on this point, the Court finds it appropriate to address *Purcell* first as its application modifies the way in which it should consider the Plaintiffs' challenge to the subject legislation. The District Court for the Middle District of Louisiana relatively recently characterized *Purcell* as a threshold issue. *See Disability Rights Louisiana v. Landry*, 2024 WL 3566698, at *1 (M.D. La. July 29, 2024). This Court agrees with that characterization.

6

The Court's initial consideration in this regard is whether it is now the "eve of an election." *Rep. Nat'l Comm.*, 589 U.S. at 424, 140 S. Ct. 1205. Although the Supreme Court has not articulated a bright-line rule as to how close to an election is too close, case law sheds some light on the issue.

Take *Abbott v. LULAC* as an example. 809 F. Supp. 3d 502 (W.D. Tex. Nov. 18, 2025), *injunction stayed on appeal*, 607 U.S. ---, 146 S. Ct. 418, 223 L. Ed. 2d 260 (2025). There, the District Court for the Western District of Texas considered a challenge to Texas' recently-enacted congressional map. *Id*. at 513. Specifically, when the Texas Legislature enacted the new map modifying its congressional districts in August 2025, the plaintiffs filed suit alleging that the map was an unconstitutional racial gerrymander and seeking an injunction precluding the utilization of the map for the 2026 elections. *Id*. On November 18, 2025, the presiding three-judge panel issued a comprehensive ruling concluding that the newly-enacted map was unconstitutional. *Id*. at 606-07. The district court enjoined utilization of the August 2025 map for the 2026 elections and ordered that the State revert to its previously-utilized 2021 map. *Id*. In reaching this conclusion, the district court squarely addressed *Purcell* and concluded that it did not bar the requested relief. *Id*.

But the plaintiffs' victory was short-lived. On December 4, 2025, the Supreme Court stayed the injunction. 146 S. Ct. 418, 419-20. After pointing out that the State was likely to succeed on the underlying merits, the Supreme Court strongly criticized the district court's decision to intervene at all:

> "This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424, 140 S. Ct. 1205, 206 L. Ed. 2d 452 (2020) (per curiam). The District Court violated that rule here. The District Court *improperly inserted itself into an active primary*

7

> *campaign, causing much confusion and upsetting the delicate*
> *federal-state balance in elections.*

*Id.* at 419 (emphasis added).

Notably, the district court's injunction was issued on November 18, 2025—around four months before the March 2026 primary election and almost a year before the November 2026 general election. Yet, the Supreme Court still stayed the injunction on *Purcell* grounds.

In another case, on May 15, 2024, the Supreme Court, citing *Purcell*, stayed an injunction issued by the District Court for the Western District of Louisiana on April 30, 2024 pertaining to Louisiana's congressional map. *Robinson v. Callais*, 144 S. Ct. 1171, 219 L. Ed. 2d 1224 (2024). The general November 2024 election was between five and six months away at the time of the Supreme Court's decision. *Id.*

In *Merrill v. Milligan*, the Supreme Court stayed a district court's injunction around four months before the primary election. 142 S. Ct. 879.[1] About one month after *Milligan*, the Supreme Court denied an emergency application inviting it to mandate that North Carolina redraw its congressional map between two and three months ahead of the upcoming primary and general elections. *Moore v. Harper*, 142 S. Ct. 1089, 212 L. Ed. 2d 247 (2022). Concurring, Justice Kavanaugh explained "[i]n light of the *Purcell* principle and the particular circumstances and timing of the impending primary elections in North Carolina, it is too late for the federal courts to order that the district lines be changed for the 2022 primary and general elections[.]" *Id.* (Kavanaugh, J., concurring).

Although the Court need not walk through them in great detail, the Fifth Circuit and district courts within this Circuit have issued decisions consistent with these timelines. *See*, *e.g.*, *Petteway*

---

[1] To be sure, the Supreme Court's brief opinion did not explicitly reference *Purcell*; however, Justice Kavanaugh's concurring opinion addressed it at length.

*v. Galveston Cnty., Texas*, 87 F.4th 721 (5th Cir. 2023) (en banc) (staying district court's remedial order approximately three months before primary election); *Disability Rights La.*, 2024 WL 3566698 at *2 (concluding, in a July 29, 2024 decision, that "there's no serious dispute that the instant [motion for preliminary injunction] was filed too close to the November 5, 2024, election, so the key issue is whether Plaintiff has demonstrated the four requirements for overcoming *Purcell*"); *Singleton v. East Baton Parish Sch. Bd.*, 621 F. Supp. 3d 618, 629 (M.D. La. 2022) (applying *Purcell* principle as a bar in a decision issued 83 days before election).

Reverting to the case *sub judice*, the Plaintiffs filed their Complaint [1] on July 2, 2026. They simultaneously filed their Motion for Preliminary Injunction [3], which the Court convened for hearing on July 31, 2026. That hearing concluded on August 5, 2026. The general election is scheduled for November 3, 2026. Thus, the Complaint [1] and Motion for Preliminary Injunction [3] were filed 124 days before the election date. And the preliminary injunction hearing concluded 90 days before the election.

In light of this timeline, it is of no consequence that it has not been established what constitutes the outer bounds of the eve of an election for *Purcell* purposes. Regardless of what those outer bounds may be, this case clearly falls within the parameters of *Purcell*. Again, the Supreme Court has, within the last calendar year, stayed a lower court's injunction issued much earlier than the timeline this Court now faces. *See Abbott*, 146 S. Ct. at 419.[2] To utilize the defense counsel's phrasing, we are squarely within "*Purcell* territory." [97] at p. 941. Recognizing that

---

[2] During the hearing, the Court heard extensive testimony about other pre-election day deadlines that must be met in order for the election to proceed as scheduled in accordance with the governing law. The Court will address those deadlines hereinafter but need not address them now because, even simply looking to the November 3, 2026 election date itself, it is the eve of the election.

9

reality, a federal district court, such as this one, "ordinarily should not enjoin" a state election law. *Singleton*, 621 F. Supp. 3d at 627 (quoting *Milligan*, 142 S. Ct. at 880) (Kavanaugh, J., concurring).

But *Purcell* is *not* an absolute bar to relief, as Justice Kavanaugh articulated in his *Milligan* concurrence. *Milligan*, 142 S. Ct. at 881. There, after noting that the substance of the *Purcell* principle is still developing, Justice Kavanaugh provided some additional guidance:

> Although the Court has not yet had occasion to fully spell out all of its contours, I would think that the *Purcell* principle thus might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes *at least* the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; *and* (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id*. (citations omitted; emphasis added).

District courts within this Circuit have relatively recently applied these principles in considering whether to interject in state elections. *See*, *e.g.*, *Disability Rights La.,*2024 WL 3566698 at *1; *Singleton*, 621 F. Supp. 3d at 628. While cognizant that the *Milligan* concurrence expressly disclaims constituting an exhaustive list, the Court will walk through the four considerations articulated therein.

### I.     Underlying Merits

First, the Plaintiffs must show that the merits are "entirely clearcut" in their favor. *Singleton*, 621 F. Supp. 3d at 628 (quoting *Milligan*, 142 S. Ct. at 881). The Court begins with the Complaint [1], wherein the Plaintiffs specifically articulate the following three claims:

> Count I: Vote Denial Regardless of Race (Violation of the Fourteenth Amendment);
>
> Count II: Vote Denial Based on Race (Violation of the Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the Voting Rights Act);

10

Count III: Violation of the Mississippi Constitution.

[1] at p. 11, 13, 15.

Although the Plaintiffs' claims are not entirely clear, Count I (as stated in the Complaint [1]) is seemingly based upon a one-person, one-vote theory. The Court reaches this conclusion based upon the following language in the Complaint [1]:

> H.B. 1544 and S.B. 2768 therefore afford unequal voting rights to otherwise similarly situated qualified electors residing within the same county and denies DeSoto County residents living outside the Majority-Minority Subdistrict the right to vote for the Place Four circuit judge and Place Three chancellor, both of whom will preside over all of DeSoto County.

[1] at p. 12-13.

But, to the extent the claim is based on a general one-person, one-vote theory, this claim is doomed from the start. Over 50 years ago, the Supreme Court affirmed a decision from the District Court of the Middle District of Louisiana, wherein a three-judge panel held that "the concept of one-man, one-vote apportionment does not apply to the judicial branch of government." *Wells v. Edwards*, 347 F. Supp. 453, 454 (M.D. La. 1972), *affirmed on appeal*, 409 U.S. 1095, 93 S. Ct. 904, 34 L. Ed. 2d 679 (1973). Thereafter, the Supreme Court again recognized the inapplicability of one-person, one-vote claims in judicial elections in *Chisom v. Roemer*, 501 U.S. 380, 402, 111 S. Ct. 2354, 115 L. Ed. 2d 348 (1991). In a more recent case, the District Court for the Middle District of Louisiana explicitly recognized that "[i]t is well established that the 'one-person, one vote' principle of the Equal Protection Clause of the Fourteenth Amendment does not apply to the judiciary." *Hall v. Louisiana*, 12 F. Supp. 3d 878, 887 (M.D. La. 2014) (citation omitted).

Recognizing this bar, the Plaintiffs contend that this claim is not based on a traditional one-person, one-vote theory and is therefore not precluded. In their post-hearing Memorandum [93], they put it this way:

> [A] traditional one-person, one-vote claim is premised upon the idea that in the elections of representatives, the number of representatives elected from any given district should be proportionate to the population of the district. That is, where an electoral scheme divides a jurisdiction into districts or subdistricts for elections to representative bodies, the districts and subdistricts should have nearly equal population and equal representation. In other words, an electoral scheme that permits an electoral district comprised of 5,000,000 to elect only one representative and at the same time permits an electoral district comprised of only 5,000 to elect one representative, the one-person, one-vote principle would apply.

> But that's not Plaintiffs' claim here. Plaintiffs living outside the subdistrict but within the district itself allege that they are not going to be allowed to vote at all for two of their own district's judges where state law would otherwise allow them to do so. *See* Miss. Code Ann. § 23-15-11, 23-15-985. Plaintiffs' claims simply are not the same sort of one-person, one-vote claims that other courts have held to be inapplicable to judicial elections. Rather, the relevant claim here is a general equal-protection claim—Plaintiffs living outside the subdistrict only get five votes for their own district's judges, whereas the subdistrict's voters get seven votes solely based on their address within the district and the racial makeup of the area in which they live.

[93] at p. 30-31.

They then contend that the elements of this claim, as this Court should view it, are "(1) unequal treatment (2) for an impermissible reason." *Id*. at p. 23. To support this contention, the two cases the Plaintiffs chiefly rely on are *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985), and *Lowery v. Gonzales*, 2023 WL 8449215, at *1 (5th Cir. Dec. 6, 2023)—neither of which even involve election law. In *City of Cleburne*, the Supreme Court invalidated a municipality's denial of a special use permit for the operation of a group home. *Id*. at 435, 105 S. Ct. 3249. *Lowery*, a per curiam decision from the Fifth Circuit,

involved a prisoner's complaint that the prison's placement of him with non-white inmates violated his religious beliefs. *Lowery*, 2023 WL 8449215 at *1. Having reviewed those cases, the Court finds them inapposite.

But even accepting the Plaintiffs' premise, they must show that the "unequal treatment stemmed from discriminatory intent." [93] at p. 24. The Court will address that point in detail hereinafter but ultimately concludes that the Plaintiffs have not even cleared that hurdle.

Similarly, Count III of the Complaint [1], which alleges a violation of the Mississippi Constitution, is fatally flawed. That's because the claim, which requests that this Court instruct state officials how to conform their conduct to comply with state law, is barred by sovereign immunity. *Williams on Behalf of J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)) ("Because this request impermissibly asks a federal court to instruct state officials on how to conform their conduct to state law, it is barred by the Supreme Court's decision in *Pennhurst*[.]") (internal quotation marks omitted). Indeed, in *Pennhurst*, the Supreme Court's holding on this point could not have been more clear: "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106, 104 S. Ct. 900.

To state it concisely, the Plaintiffs cannot establish that the merits are clearcut in their favor as to either Count I or Count III.[3]

That leaves only Count II, which again the Plaintiffs style as "Vote Denial Based on Race (Violation of the Fourteenth Amendment, Fifteenth Amendment, and Section 2 of the Voting Rights Act)." [1] at p. 13. But even focusing on that sole claim, confusion persists.

---

[3] In their post-hearing Memorandum [93], the Plaintiffs conceded that Count III is not viable.

The Court will begin with the Section 2 aspect.[4] Although the Supreme Court's decision in *Callais* "update[d] the *Gingles* framework [to] realign it with the text of § 2 and constitutional principles[,]" a plaintiff asserting a Section 2 claim still must establish the three *Gingles* preconditions, in addition to satisfying the totality of the circumstances inquiry. *Callais*, 146 S. Ct. at 1157, 60. During the preliminary injunction hearing, the Plaintiffs presented *no* proof to satisfy the *Gingles* preconditions. For instance, they did not produce an illustrative map as required by the first precondition (though counsel argued in closing argument that the Court should accept the entire county as the illustrative map). Similarly, other than the testimony of Foster (who is not an expert) that Black candidates prevailed in multiple municipal elections in the Horn Lake area in 2025, the Plaintiffs presented no evidence whatsoever regarding the existence of racial bloc voting, which would go toward the second and third preconditions. *Id.* at 1159. In fact, several of the Plaintiffs' witnesses (including Foster) were quick to point out that the DeSoto County Sheriff, who is elected on a countywide basis, is Black and that White voters supported him. Of course, this would actually cut *against* the Plaintiffs' burden on a Section 2 claim to establish that racial bloc voting persists such that White voters are unable to select their candidate of choice. As to the totality of the circumstances, the Plaintiffs put on no proof whatsoever that White voters in DeSoto County have been subjected to discrimination in regard to voting, much less "present-day intentional racial discrimination regarding voting" as required to prevail on such a claim. *Id.* at 1160.

---

[4] The Court presumes that the Plaintiffs' Section 2 claim pertains to Kirby Carter, who the Complaint [1] alleges is a "White voter within the Majority-Minority Subdistrict[.]" [1] at p. 4. The Court reaches this conclusion based on the allegation in the Complaint [1] that the Legislature, by creating the subdistrict, "has unlawfully diluted the voting power *of white voters within the Majority-Minority Subdistrict* for no reason other than race." *Id*. at p. 15 (emphasis added).

Ultimately, the Plaintiffs did not produce an illustrative map, did not produce any evidence as to racially polarized voting (such as testimony regarding an ecological inference analysis), and did not provide any evidence regarding present-day discrimination as necessary to prevail on a Section 2 claim. In short, there is no basis whatsoever for the Court to conclude that the merits are entirely clearcut in the Plaintiffs' favor on their Section 2 claim.

The Court therefore turns to the Fourteenth Amendment aspect of the claim. The Fourteenth Amendment "prohibit[s] a State from engaging in a racial gerrymander unless it can satisfy strict scrutiny." *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 7, 144 S. Ct. 1221, 218 L. Ed. 2d 512 (2024). The Supreme Court has "repeatedly emphasized that federal courts must 'exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.'" *Id.*, 144 S. Ct. 1221 (quoting *Miller v. Johnson*, 515 U.S. 900, 915-16, 115 S. Ct. 2475, 132 L. Ed. 2d 762 (1995)). A plaintiff bears the burden to "show that race was the 'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.*, 144 S. Ct. 1221 (quoting *Miller*, 515 U.S. at 916, 115 S. Ct. 2475).[5]

Here, the Plaintiffs place significant emphasis on the statements made by Legislators on the House floor on February 6, 2025 when debating H.B. 1544. To be sure, the transcript from that debate, which the Court accepted into evidence, includes numerous references to race. For instance, Judiciary B Committee Chairman Kevin Horan, speaking from the well, specifically referenced race:

> But if you look in DeSoto County, that subdistrict is a subdistrict
> that allows -- in DeSoto County where they have an increasing

---

[5] Again, the Court notes that the Complaint [1] itself is not clear as to the Plaintiffs' theory of relief under the Fourteenth Amendment. Having made that disclaimer, the Court perceives the Plaintiffs' Equal Protection claim—in at least some respect—to be based on a racial gerrymander theory. The Court will therefore address it as being brought on that basis.

> majority minority population for those individuals in that subdistrict to elect the candidate of their choice. The same way with the district, Monroe and Lee County, that's coming forward; the same way with the chancery district in Lowndes County that covers part of Starkville; and Forrest County that covers the downtown area. We are increasing African American BVAP or APVAP districts. We are not decreasing them, Gentleman. It's just not -- the map doesn't represent that.

[86], Ex. 4 at p. 86.

Later in the transcript, Chairman Horan again stated that, by passing the legislation, the Legislature was "creating additional African American subdistricts." *Id*. at p. 105. The Plaintiffs assert that the Legislature indeed accomplished this goal because the conference report, which accompanied the subject legislation and which the Legislators were provided prior to voting on the bills, states that the BVAP for the subdistrict is 50.52% (in a county that as a whole, according to the Complaint [1], is 24.85% Any Part Black and 67.13% White). *See* [86], Ex. 3 at p. 3. In other words, the Plaintiffs emphasize that race was referenced during the debate leading up to the legislation being passed and that the statistics bear out that a majority-minority subdistrict was in fact accomplished. Relying on this, they contend that the subdistrict must be an unconstitutional racial gerrymander.

The problem with the Plaintiffs' argument is that that minimal evidence alone is insufficient to carry their burden to prove an unconstitutional racial gerrymander, even at this preliminary stage—for multiple reasons.

At the outset, the Supreme Court has made clear that federal courts must apply the presumption of legislative good faith, which "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10, 144 S. Ct. 1221 (citing *Abbott v. Perez*, 585 U.S. 579, 610-12, 138 S. Ct. 2305, 201 L. Ed. 2d 714 (2018)).

16

While the Plaintiffs emphasize the portions of the transcript where race was discussed, their witness Daniel Eubanks, who represents the 25th House District in the Mississippi House of Representatives (all of which lies within DeSoto County), also testified that the subject legislation was passed so that DeSoto County could gain additional judges in order to address a substantial docket backlog. *See* [94] at p. 121. Indeed, he testified that the need for additional judges is what ultimately drove his vote in favor of the legislation. *Id*. The bill itself provides an explanation of the considerations that the Legislature considered in determining the appropriate number of judges in a particular district:

> (3)     The number of judges in each circuit court district shall be determined by the Legislature based upon the following criteria:
>
> (a) The population of the district;
>
> (b) The number of cases filed in the district;
>
> (c) The case load of each judge in the district;
>
> (d) The geographic area of the district;
>
> (e) An analysis of the needs of the district by the court personnel of the district; and
>
> (f) Any other appropriate criteria as determined by the Legislature.

[86], Ex. 1 at p. 3-4.

On cross-examination, Eubanks agreed that Chairman Horan "repeatedly referenced those criteria as being considered in arriving at the maps that were being presented to the legislature[.]" [94] at p. 136. As noted by the Defendants, Chairman Horan stated that "[t]his is law. This is statutory criteria that the constitution says, the state constitution says that you are to make those

criteria, basically formulate the criteria that they would use in determining whether or not chancery and circuit courts need to be changed." [86], Ex. 4 at p. 34.[6]

The Plaintiffs came forward with nothing in the form of evidence to rebut the other considerations that even their own witness admits were considered in "arriving at the maps that were being presented." [94] at p. 136. In other words, the Plaintiffs presented nothing to overcome the presumption of legislative good faith. In the recent *Abbott* case, the Supreme Court specifically criticized the district court for its failure "to honor the presumption of legislative good faith" when it "constru[ed] ambiguous direct and circumstantial evidence against the legislature." *Abbott*, 146 S. Ct. at 419 (citing *Alexander*, 602 U.S. at 10, 144 S. Ct. 1221).

The Plaintiffs' strategy of simply pointing to portions of the transcript where race was discussed and the statistics indicating that a majority-minority subdistrict was ultimately enacted is wholly insufficient. As the Defendants emphasize, the Plaintiffs have not presented any evidence as to who drew the map or the process that went into arriving at the placement of the particular boundaries of the subdistrict.[7] Instead, they simply ask this Court to make an inferential leap that an unconstitutional gerrymander must exist. Again, even setting aside the thin amount of evidence

---

[6] The Court is cognizant, as the Plaintiffs emphasize in their post-hearing Memorandum [93], that these statutory considerations pertain to the number of judges in each circuit court—not necessarily the way in which the map was drawn. But it is still noteworthy that the Legislature seemingly relied on the criteria to some extent in the legislative process.

[7] Additionally, the Court also points out that while it admitted the conference report (which contains the demographic data for the districts), the Plaintiffs presented no evidence to substantiate that the underlying data itself is accurate and reliable. The data is a summary chart that purports to be based on 2020 Census Data. Ultimately, the Court, recognizing the posture of this case being only at the preliminary injunction stage, admitted the conference report into evidence. But the Plaintiffs' failure to provide proof pertaining to the underlying data is noteworthy. It is also noteworthy that, as will be addressed more fully hereinafter, the legislation itself listed outdated precinct names and included split precincts without a specific explanation as to how the precincts would actually be split. The Court was presented no evidence to ensure that the conference report data ultimately tracked the precinct lines which, again, were not delineated in the legislation. In other words, the Court was never presented evidence that would ensure that the BVAP data on which the Plaintiffs heavily rely is actually a true representation of the population statistics for the subdistrict as ultimately drawn.

the Plaintiffs presented in that regard, this argument ignores the presumption of legislative good faith.

Ultimately, federal court review of legislation of this nature "represents a serious intrusion on the most vital of local functions." *Alexander*, 602 U.S. at 6, 144 S. Ct. 1221 (quoting *Miller*, 515 U.S. at 915, 115 S. Ct. 2475). The Plaintiffs have not provided sufficient evidence to justify this Court's involvement.

But set aside all those inadequacies for a moment. Even if the Plaintiffs could show that race predominated in the Legislature's decision as to the boundaries of the subdistrict, that would not in and of itself end the inquiry. In *Callais*, the Supreme Court specifically addressed "whether compliance with the Voting Rights act can indeed provide a compelling reason for race-based districting. We now answer that question: Compliance with § 2, *as properly construed*, can provide such a reason." *Callais*, 146 S. Ct. at 1143 (emphasis in original). In other words, the Supreme Court specifically held that compliance with Section 2 can provide a proper basis for race-based districting. Against that backdrop, the Court again looks to the comments of Chairman Horan that the Plaintiffs emphasized in their questioning of Eubanks:

> But if you look in DeSoto County, that subdistrict is a subdistrict that allows -- in DeSoto County where they have an increasing majority-minority population for those individuals in that subdistrict to elect the candidate of their choice.

[94] at p. 86.

Thus, even simply looking to the evidence that the Plaintiffs themselves emphasize, another plausible reason for the Legislature's conduct (which is entitled to the presumption of legislative good faith) was to create an opportunity for a minority population to elect their candidate of choice—in other words, Section 2 compliance.

19

Ultimately, disregarding the flaws with the manner in which the Plaintiffs have pled their claims, they have come nowhere near providing the requisite level of evidence to establish that the merits are clearcut in their favor. Again, their strategy of simply placing into evidence the debate from the Mississippi House floor where race was discussed, along with the conference report and a map of the subdistrict, is insufficient. It ignores the presumption of legislative good faith and fails to take into account the portions of the debate where the Legislature discussed other principles that led to the creation of the map. And even to the extent the Legislature did consider race, the Plaintiffs have provided no argument or proof to rebut the reality that the Supreme Court made clear in *Callais* that "compliance with the Voting Rights Act can indeed provide a compelling reason for race-based districting." *Callais*, 146 S. Ct. at 1143.

In reaching this conclusion, the Court certainly does not terminally foreclose the Plaintiffs' claims. Nor does the Court turn a blind eye to the fact that numerous members of the Mississippi House of Representatives, including the Judiciary B Chairman, discussed race during the February 6, 2025 floor debate. The Plaintiffs may very well eventually be able to prevail on their claims following discovery and a trial on the merits, but they must do far more than present minimal evidence and request that the Court make inferential leaps.

The evidence presented at the preliminary injunction hearing falls below the requisite threshold for a plaintiff to prevail in a case of this nature. The Plaintiffs have not shown that the merits are clearcut in their favor.

## II.    *Irreparable Harm*

The next consideration is whether the Plaintiffs will suffer irreparable harm absent the issuance of an injunction. *Singleton*, 621 F. Supp. 3d at 627 (quoting *Milligan*, 142 S. Ct. at 880) (Kavanaugh, J., concurring). In their post-hearing Memorandum [93], the Plaintiffs contend that

20

the injury they seek to prevent is the holding of "an election under an unlawful electoral scheme with discriminatory effects[.]" [93] at p. 17.

This Court is well aware that "once an 'election occurs, there can be no do-overs and no redress' for voters whose votes were diluted." *Robinson v. Ardoin*, 86 F.4th 574, 600 (5th Cir. 2024) (quoting *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). But, here, the Plaintiffs have not provided, at this stage in the proceeding, any evidence to establish that their votes are actually being diluted or that the subject legislation constitutes an unconstitutional racial gerrymander.

Furthermore, as a practical matter, the *Purcell* principle itself would not even exist if there were no circumstances where a plaintiff may ultimately be able to prevail on a racial gerrymander or vote dilution claim but the election be too close for a federal court to take action prior to an upcoming election. In other words, in applying the *Purcell* principle time and again, the Supreme Court has seemingly presupposed that there may be circumstances where a state election occurs pursuant to a map that is eventually ruled unlawful, yet it not be appropriate for a federal court to inject itself into the dispute prior to the election.

Thus, even if the Plaintiffs had carried their burden as to the merits, that alone does not *ipso facto* establish irreparable harm.

### III.    Undue Delay

As to the third consideration, a plaintiff must show that he "has not unduly delayed bringing the complaint to court[.]" *Singleton*, 621 F. Supp. 3d at 628 (quoting *Milligan*, 142 S. Ct. at 881).

There is no dispute that the subject legislation was signed into law by the Governor on April 23, 2025. Eubanks testified that he had conversations with two of the Plaintiffs—Foster and

Ligon—about the bills and his concerns surrounding them around the time that they were signed into law:

> Q.    Okay. So all of these concerns were -- was communicated with various people throughout DeSoto County back in 2025; correct?
>
> A.    From 2025 on.
>
> Q.    Okay. Did that include the plaintiffs in this case? Did you have discussions with them as to the issues and the concerns that you had about these bills?
>
> A.    I know them personally. Mr. Foster is my supervisor. Katie is somebody that I know just from -- she is very politically active, and the conversations come up; so, yes, I had conversations with them.
>
> Q.    So the plaintiffs were aware as early as April 23rd of 2025, or shortly after the session, of the concerns and the questions that you had with respect to House Bill 1544 and Senate Bill 2678; correct?
>
> A.    Yes, which is exactly why we lobbied in 2026 to try and get the chairman to fix it.

[94] at p. 133.

Although Ligon denied having this conversation with Eubanks, Foster admitted to discussing the matter with Eubanks in the summer of 2025. He testified that he discussed the legislation with Eubanks after learning about it via DeSoto County's attorney.

While admitting that he knew about the subject legislation and its creation of the subdistrict no later than July 2025, Foster gave a variety of reasons for the failure to immediately initiate litigation. For instance, he points out that the subject legislation itself included inaccurate precinct names and some of the precincts were split but did not have any explanation as to the manner in which they were split. Foster testified that he could not tell from the description within the legislation where the subdistrict would be located. He also testified that he attempted to obtain a

detailed map of the subdistrict without success. Specifically, he stated that he was only able to obtain a "PDF that showed the entire state's judicial layouts with a little blip in the top corner of DeSoto County that showed kind of a subdistrict within the county, but it wasn't zoomed in enough to even see exactly what areas, roads, or precincts, or anything within the exact road layout of that map." [95] at p. 342.

The Court heard testimony from multiple witnesses about the fact that the legislation itself did not contain accurate precinct names for the subdistrict. In fact, the Court itself made inquiry to counsel about the issue on multiple occasions throughout the hearing. The fact that the legislation itself contained inaccurate precinct names is undisputed.

But it is also undisputed—and quite noteworthy—that Judith Wammack, who works as a GIS analyst for DeSoto County, produced a map of the subdistrict to Meacham in early January 2026 *within 24 hours of receiving a request from Meacham to do so*. Although the Court struggles to believe Foster's testimony that he was unable to obtain a copy of the subdistrict map sooner, there is certainly nothing that would have prevented him—or any of the Plaintiffs—from requesting a map from Wammack in early January 2026—just like Meacham did. Yet, the Plaintiffs took no legal action.

Even though none of the Plaintiffs specifically reached out to Wammack to request a map, the evidence presented at the hearing indicates that DeSoto County (the County for which Foster serves as a Supervisor) has had a map of the subdistrict listed on its website since January 15, 2026. Yet, the Plaintiffs took no legal action.

Foster testified that he did not initiate litigation in early 2026 or sooner because he was hopeful that the Legislature would address the issue in the 2026 regular session. It is undisputed

23

that the 2026 regular session ended in April 2026 without any legislative action being taken on the issue. Yet, the Plaintiffs took no legal action.

On April 29, 2026, the Supreme Court decided *Callais*. Taking the Plaintiffs' theory of the case as true, that decision changed everything. Yet, the Plaintiffs *still* took no legal action.

Foster testified that after the Supreme Court's *Callais* decision, he was hopeful that the Governor would add the DeSoto County subdistrict to the agenda at an upcoming Legislative special session which had been scheduled for 21 days after the *Callais* decision, or, May 20, 2025. But that date came and went without any special session even being held. *Still*, the Plaintiffs took no legal action.

Ultimately, 64 days after the *Callais* decision was handed down and 124 days before the November 3, 2026 election, this lawsuit was filed.

Throughout the hearing, the Plaintiffs attempted to downplay the delay. Foster testified that DeSoto County—and he, by extension as a Supervisor—was involved in other Voting Rights litigation during the 2025-2026 time frame. He also testified that he took other action, such as requesting that state legislators address the matter in the 2026 regular session and sending a letter (in his capacity as a member of the Board of Supervisors) to the Governor on May 5, 2026, requesting that the Governor add the DeSoto County subdistrict to the agenda for the then-upcoming special session. Additionally, Foster testified that he had to engage in "research and figure out exactly what all would be involved in" filing a lawsuit of this nature and further stated that he did not have the money necessary to pursue it. [95] at p. 360.

In this Court's view, those contentions appear to be nothing more than post-hoc rationalizations for the failure to act. Notably, in their pre-hearing briefing, the Plaintiffs provided two arguments as to why any inaction was excusable. First, they argued that "[a]t least one

24

legislator from DeSoto County now acknowledges that he either didn't know or was misled regarding the contents of both bills and their effect on DeSoto County." [50] at p. 7. Second, they asserted that "[a]ny delay in [filing suit] is excusable given pre-*Callais* uncertainty and the State's public, post-*Callais* indecision." *Id*. at p. 8.

This was not borne out by the evidence presented at the hearing. As to their first argument, Eubanks testified that he—and the entire DeSoto County caucus—was aware of what was in the legislation. *See* [94] at p. 48 ("There was a lot of discussion among the DeSoto caucus about [this subdistrict being created]."). In fact, Eubanks said that he spoke with Chairman Horan about the matter. This undercuts the Plaintiffs' pre-hearing argument.

And then there's the *Callais* excuse, which is flawed for two reasons. First, nothing prevented the Plaintiffs from filing this lawsuit prior to the *Callais* decision. As defense counsel pointed out during the questioning of Foster on cross-examination, the *Callais* plaintiffs *themselves* did not delay. There, the plaintiffs, a group of White voters, challenged Louisiana's newly-enacted congressional map creating an additional majority-Black district as an unconstitutional racial gerrymander—and did so within nine days of the district being created. *See Callais v. Landry*, 732 F. Supp. 3d 574, 584 (W.D. La. Apr. 30, 2024). In other words, those plaintiffs did not delay or wait on a Supreme Court decision to further develop a theory of relief that they thought they could utilize—instead, they almost immediately took action. Additionally, it is noteworthy that both Ligon and Foster testified as to their dissatisfaction that a subdistrict, of which they are not part of, possesses an "extra vote." [95] at p. 216, 442. Of course, that fact has nothing whatsoever to do with the Supreme Court's decision in *Callais*.

The Plaintiffs' *Callais* excuse is further flawed because, even assuming that the case created some legal theory which was not previously available to the Plaintiffs (it did not), they *still*

25

delayed over two months before initiating this litigation. They claim that this Court should ignore that delay because Foster was engaging in other, non-litigation conduct to attempt to rectify the issue during that time period. But the Plaintiffs have cited no authority to support their theory that that type of conduct can be considered in determining whether a plaintiff has unduly delayed. Ultimately, it appears that Foster made a choice to attempt to resolve his grievance outside of litigation. In doing so, he unduly delayed bringing his grievance to this Court.

As to the other arguments the Plaintiffs pointed out during the hearing, the fact that DeSoto County was involved in other Voting Rights Act during the 2025-2026 time frame has no bearing on this analysis. And regarding Foster's testimony that his delay was to some extent attributable to the costs of litigation and his efforts to obtain qualified counsel, the District Court for the Middle District of Louisiana has recently rejected a similar argument. *See Disability Rights La.*, 2024 WL 3566698 at *3 ("While the Court is sympathetic to Plaintiff's efforts to get the best counsel possible, Plaintiff could have still proceeded sooner with less-able counsel and fewer resources, particularly with the election fast-approaching."). While recognizing that decision is not binding, the Court agrees with its logic.

The reality is that the subject legislation was signed into law more than 14 months before this lawsuit was filed. After that significant delay, the Plaintiffs urge this Court to upend an election that is right on the cusp of commencing. The Plaintiffs' conduct constitutes a textbook example of undue delay.

*IV.    Feasibility*

The Court also considers whether the changes in question are feasible "before the election without significant cost, confusion, or hardship." *Singleton*, 621 F. Supp. 3d at 629 (quoting *Milligan*, 142 S. Ct. at 881).

26

Laura Henderson-Courtney, who serves as a senior attorney in the elections division at the Secretary of State's office, testified at length regarding election-related deadlines. The Elections Division of the Secretary of State's office provides on its website a 2026 elections calendar, which contains numerous deadlines. That calendar was admitted into evidence, and Henderson-Courtney testified at length about many of the deadlines.

She testified that the State Board of Election Commissioners is scheduled to meet on August 25, 2026 to finalize ballots for the November 2026 election. Once the ballots are finalized, they are "pushed down" to the Circuit Clerk's offices across the State. The statutory deadline for sample ballots to be finalized is 60 days before the election—or, in this case, September 4, 2026. Absentee voting begins on September 21, 2026.

The Plaintiffs make much of the fact that the statutory language setting the deadlines contains an exception for when the ballot is not finalized. In other words, they contend that the statutory deadlines are capable of being pushed back. But the Court sees no need to expend considerable time addressing whether the ballot deadline can legally be pushed back some period of time. Because even assuming as much—that is, that the deadlines can be pushed back, the Plaintiffs have not shown that their alternative remedies are feasible "without significant cost, confusion, or hardship." *Singleton*, 621 F. Supp. 3d at 629 (quoting *Milligan*, 142 S. Ct. at 881).

As noted previously, the Plaintiffs propose that the Court strike down the subdistrict and reopen the qualifying window for a period of one week and allow the election to go forward (with new candidates) as scheduled. Alternatively, they request that the Court strike down the subdistrict, reopen the qualifying deadline, and direct that the elections be held at a later date.

In considering whether the Plaintiffs' proposed remedies would impose significant cost, confusion, or hardship, the Court need look no further than the candidate who intervened as a

27

Defendant in this case—Malenda Harris Meacham. During her testimony, Meacham testified extensively about the efforts she has expended over the past several months in campaigning for the chancery position to be elected from the subdistrict. The Court found her testimony credible. She has expended considerable money toward the race—evidence of the same was admitted during the hearing. In fact, some of that money was utilized to purchase maps of the subdistrict that she has utilized to educate voters. In addition to money, Meacham has expended considerable time and effort in pursuing the position. She has largely curtailed her private practice as a solo practitioner so that she can focus on the campaign. She further testified that her entire campaign strategy would be undermined if the district in which she is running or her opponent were changed at this late juncture. The Court finds that Meacham personally would be subject to significant cost and hardship if either of the Plaintiffs' proposed remedies were implemented.

Furthermore, the Court finds that there is a significant risk of voter confusion if the subdistrict were struck down at this time. DeSoto County has for months been advising voters about the existence of the subdistrict, by virtue of the subdistrict map being included on the County's website. There is no dispute that Meacham (and others) have been campaigning within the subdistrict and targeting their campaign activities toward voters within the subdistrict. Reopening the qualifying deadline where new candidates could join the race would undoubtedly cause confusion.

The Plaintiffs' proposal of striking down the subdistrict and reopening the qualifying window for a one-week period ahead of an election that is less than 90 days away is wholly impractical.[8]

---

[8] The Plaintiffs emphasize that a special election will be held on an expedited timeline of this nature due to the Governor's appointment of Celeste Wilson, who was a sitting circuit court judge in DeSoto County, to the Mississippi Supreme Court. But the Mississippi Code specifically authorizes proceeding in that manner because of the specific circumstances at issue there. *See* MISS. CODE ANN. § 23-15-977(4). And the

*V.      Summary*

In short, the Plaintiffs have wholly failed to carry their burden. They cannot overcome *Purcell* and are entitled to no relief at this stage.

As noted previously, in reaching this conclusion, the Court is *not* issuing a definitive ruling that the Plaintiffs could *never* obtain relief. In reviewing the House floor debate from February 6, 2026, it is clear that race was discussed by members of the Mississippi House of Representatives. But the problem with the Plaintiffs' theory is that that fact alone is insufficient. As the Defendants point out, the consideration of race alone is not unconstitutional. The Plaintiffs must do far more than point to a map they dislike and make conclusory arguments pertaining to the same. The Court was not presented *evidence* to justify the requested relief.

As one additional point, the Court reverts to the initial disagreement between the parties as to whether the traditional four factor preliminary injunction test or the modified test should be applied. If the Court had applied the traditional four factor test as the Plaintiffs suggested, the outcome would remain unchanged. For the same reasons previously addressed, the Plaintiffs have not shown a substantial likelihood of success on the merits, irreparable harm, or that the equities weigh in their favor. *See, e.g.*, *Bluefield Water Ass'n, Inc. v. City of Starkville, Mississippi*, 557 F.3d 250, 252-53 (5th Cir. 2009) (articulating the four requirements to establish entitlement to a preliminary injunction).

Again, "the Supreme Court's election-law precedents . . . establish (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene

---

concerns about hardship on candidates and voter confusion in general are simply incongruent when not facing a situation where candidates have been campaigning in a particular subdistrict for months.

29

that principle." *Singleton*, 621 F. Supp. 3d at 627 (quoting *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring) (citing *Purcell*, 549 U.S. 1, 127 S. Ct. 5).

Consistent with this clear directive and recognizing that this is not an atypical case that necessitates judicial intervention, this Court declines to involve itself in the upcoming election.

*Conclusion*

The Plaintiffs are not entitled to a preliminary injunction. The Motion [3] is DENIED.

SO ORDERED, this the 13th day of August, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE